# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| MILA US INC, | § | Case No. 1:25-cv-01359-ADA |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | **JURY TRIAL DEMANDED** |
| | § | |
| NVIDIA CORPORATION, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## NVIDIA CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ......................................................................................................... 1

II.     ARGUMENT................................................................................................................. 1

    A.      U.S. Patent No. 7,757,048.................................................................................. 1

        1.      "data transferor" ('048 Patent, claims 29, 40) ........................................ 2

            a)      This limitation is means-plus-function. ........................................ 2

            b)      This limitation is indefinite because the specification does
                not disclose adequate structure. ...................................................... 4

    B.      U.S. Patent No. 7,805,578.................................................................................. 6

        1.      "a memory interface block" ('578 Patent, claim 14) ................................ 6

            a)      This limitation is means-plus-function. ........................................ 6

            b)      This limitation is indefinite because the specification does
                not disclose adequate structure. ...................................................... 7

    C.      U.S. Patent No. 7,924,296.................................................................................. 8

        1.      "wherein the plurality of image tiles are generated [from the at
            least one of the plurality of images] when the plurality of DMA
            channels perform the fetching" ('296 Patent, claims 1, 21) ..................... 9

            a)      The claim language as a whole supports NVIDIA's
                construction........................................................................................ 10

            b)      The specification supports NVIDIA's construction. ................... 11

            c)      The prosecution history supports NVIDIA's construction. ......... 11

    D.      U.S. Patent No. 7,966,436.................................................................................. 13

        1.      Preamble: "A data transmitter disposed between a data processor
            and a display device, the data transmitter comprising:" ('436
            Patent, claim 1) ........................................................................................ 14

        2.      "setting data" and "device data" ('436 Patent, claim 1) .......................... 15

        3.      "a low-speed transmission unit configured to relay and transmit . . .
            and receive . . . data" ('436 Patent, claim 1).......................................... 17

            a)      This limitation is means-plus-function. ........................................ 17

            b)      This limitation is indefinite because the specification does
                not disclose adequate structure. ...................................................... 18

    E.      U.S. Patent No. 8,151,136.................................................................................. 19

i

1.    Preambles: "A main processor, being coupled to at least one application processor and controlling an operation of the application processor, the main processor comprising:" ('136 Patent, claim 9) / "A code data error correcting method by a main processor included in a digital processing device, the device comprising a main processor and at least one application processor, the method comprising:" ('136 Patent, claim 20) ................................... 20

F.    U.S. Patent No. 8,275,975 ................................................................................ 22

1.    Preamble: "A sequencer controlled system for a system-on-chip (SoC) integrated circuit design, comprising:" ('975 Patent, claim 1) ...... 22

2.    "the status information consisting of available direct memory access (DMA) transfer channels and others selected from the group consisting of processes running on said SoC, available memory area for storage, and available processing power" ('975 Patent, claim 1) ................................................................................... 24

a)    "Consisting of" excludes unrecited information. ........................ 24

b)    The specification supports a construction that excludes unrecited information. ................................................................ 25

c)    The patentee deliberately limited the term's scope during prosecution. ................................................................................ 26

3.    "embedded processor" ('975 Patent, claim 1) ........................................ 27

4.    "third hardware functional unit" ('975 Patent, claim 5) .......................... 28

III. CONCLUSION ................................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
830 F.3d 1341 (Fed. Cir. 2016)........................................................................................3

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
651 F.3d 1318 (Fed. Cir. 2011).....................................................................................9, 11

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
637 F.3d 1324 (Fed. Cir. 2011).......................................................................................12

*Azurity Pharms., Inc. v. Alkem Lab'ys Ltd.*,
133 F.4th 1359 (Fed. Cir. 2025) .....................................................................................27

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*,
533 F.3d 1362 (Fed. Cir. 2008).................................................................................3, 5, 7

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002)........................................................................................23

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
677 F.3d 1361 (Fed. Cir. 2012).......................................................................................28

*In re Cruciferous Sprout Litig.*,
301 F.3d 1343 (Fed. Cir. 2002).......................................................................................23

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
899 F.3d 1291 (Fed. Cir. 2018)....................................................................................5, 17

*Digit. Retail Apps, Inc. v. H-E-B, LP*,
No. 6-19-CV-00167-ADA, 2020 WL 376664 (W.D. Tex. Jan. 23, 2020) .........................4, 18

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
673 F.3d 1361 (Fed. Cir. 2012).......................................................................................29

*Fintiv, Inc. v. PayPal Holdings, Inc.*,
134 F.4th 1377 (Fed. Cir. 2025) .....................................................................................3, 4

*In re Fought*,
941 F.3d 1175 (Fed. Cir. 2019)...............................................................................14, 21, 22

*Info-Hold, Inc. v. Muzak LLC*,
783 F.3d 1365 (Fed. Cir. 2015)....................................................................................9, 10

*Int'l Biomedical, Ltd. v. Gen. Elec. Co.*,
No. 1-14-CV-397-LY, 2015 WL 7431408 (W.D. Tex. Nov. 20, 2015)................................25

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) .........................................................................3, 10, 28

*Microsoft Corp. v. Multi–Tech Sys.*,
357 F.3d 1340 (Fed. Cir. 2004)................................................................................12

*Mobile Motherboard Inc. v. Asustek Comput. Inc.*,
No. WA-23-CV-00325-KC, 2024 WL 457818 (W.D. Tex. Feb. 5, 2024).............................16

*MTD Prods. Inc. v. Iancu*,
933 F.3d 1336 (Fed. Cir. 2019)................................................................................17

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
831 F.3d 1350 (Fed. Cir. 2016)........................................................................24, 25, 26

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)................................................................................................15

*Orange Elec. Co. v. Autel Intelligent Tech., Corp.*,
No. 2:21-CV-00240-JRG, 2023 WL 300137 (E.D. Tex. Jan. 18, 2023) .................................17

*Perfect Co. v. Adaptics Ltd.*,
No. C14-5976-RBL, 2019 WL 700000 (W.D. Wash. Feb. 20, 2019)....................................11

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................................12

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999)................................................................................14

*Poly-Am. L.P. v. GSE Lining Tech. Inc.*,
383 F.3d 1303 (Fed. Cir. 2004)...........................................................................21, 23

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 734 (Fed. Cir. 2016)..................................................................................12

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
739 F.3d 1367 (Fed. Cir. 2014)........................................................................14, 21, 23

*Ravgen, Inc. v. Natera, Inc.*,
No. 1:20-CV-00692-ADA, 2021 WL 9349178 (W.D. Tex. Nov. 8, 2021)............................25

*Realtime Data LLC v. Acronis, Inc.*,
No. 1:17-CV-11279-IT, 2021 WL 11749802 (D. Mass. Dec. 21, 2021)................................4

*Seachange Int'l, Inc. v. C-COR, Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005)..................................................................................21, 22

*Siliconix Inc. v. Denso Corp.*,
    No. C 05-01507 WHA, 2006 WL 6131028 (N.D. Cal. June 8, 2006).....................................11

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)....................................................................................2, 3, 6

**Statutes**

35 U.S.C. § 112 ¶ 6.................................................................................................2, 4, 7, 18

**TABLE OF ABBREVIATIONS**

| Term | Abbreviation |
|---|---|
| Plaintiff Mila US Inc | "Mila" |
| Defendant Nvidia Corporation | "NVIDIA" |
| U.S. Patent No. 7,757,048 | "'048 Patent" |
| U.S. Patent No. 7,805,578 | "'578 Patent" |
| U.S. Patent No. 7,924,296 | "'296 Patent" |
| U.S. Patent No. 7,966,436 | "'436 Patent" |
| U.S. Patent No. 8,151,136 | "'136 Patent" |
| U.S. Patent No. 8,275,975 | "'975 Patent" |
| April 16, 2026 Declaration of Vivek Subramanian | "Subramanian Decl." |
| Exhibit to the April 16, 2026 Declaration of Ryan Malloy in Support of Defendant's Opening Claim Construction | "Malloy Decl. Ex." |

## I.  INTRODUCTION

The disputed claim terms raise several core issues in patent law.  For example, does "consisting of" permit more than what is recited?  Are preambles limiting when they recite the antecedent basis for terms in a claim's body?  Does "block" convey sufficiently definite structure to a POSITA, or is it a nonce term that invokes means-plus-function treatment?

The Court should adopt NVIDIA's constructions of the disputed claim terms, as they answer these questions consistent with Federal Circuit precedent and provide jurors with clarity as to terms' plain and ordinary meanings.  Mila is wrong that "no construction [is] necessary" for any term.  The Court should resolve the parties' disputes as a matter of law.

## II.  ARGUMENT

### A.   U.S. Patent No. 7,757,048

The '048 Patent and the '578 Patent derive from the same application and share the same specification.  Both patents are directed to a purportedly novel "data processor apparatus and memory interface."  (*See* '048 Patent, Title, Abstract; '578 Patent, Title, Abstract.)  The specification explains that prior art buses that broadcast data to parallel processors experienced "routing congestion."  ('048 Patent, 2:19–23.)  To address this, the specification discloses sending the data to memories connected to the processors instead of to the processors themselves and issuing commands to the processors to download the data when needed.  (*Id.*, 2:27–3:10.)

Figure 2 (annotated below) illustrates the purported invention.  A memory interface (orange) sends data over a data bus (pink) to four memories (purple) connected to eight computational units ("CUs") (blue).  (*Id.*, 7:43–55.)  A separate controller (red) sends data download commands over a control bus (yellow) to the CUs, which in response download data from the memories' data outputs (green).  (*Id.*, 6:1–3, 8:58–9:14.)

1



FIG. 2

1.    "data transferor" ('048 Patent, claims 29, 40)

| Mila's Construction | NVIDIA's Construction |
|---|---|
| No construction necessary | This term is subject to 112 ¶ 6. <br><br> Function: "transferring said data received at said data input to a plurality of different memory locations in said memory so that a copy of said data is stored in each of said different memory locations" <br><br> Structure: No corresponding structure (indefinite) |

a)    **This limitation is means-plus-function.**

"Data transferor" should be construed as a means-plus-function limitation subject to 35 U.S.C. § 112 ¶ 6. A claim limitation is means-plus-function if it "fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015)

2

(quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). Nonce words "can operate as a substitute for 'means' in the context of § 112, para. 6." *Id.* at 1350.

A POSITA would have understood "data transferor" in the context of the '048 Patent to refer to a functional module in the memory interface that performs the recited data transfer activity. (Subramanian Decl. ¶¶ 52–54.) The term "data transferor" lacked a structural meaning to POSITAs at the time of the application for the '048 Patent and is not defined or discussed in the specification. (*Id.* ¶ 55.)

The claims themselves do not provide structure for the "data transferor" and instead show only what the "data transferor" is *not*. In addition to "data transferor," claims 29 and 40 both separately recite a "data input" and a "data output which transfers data," establishing that a "data transferor" is distinct from data inputs and outputs. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809–10 (Fed. Cir. 2021) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." (internal quotations omitted)). Other claims recite a "data bus," which evidences that a "data transferor" is not a data bus. (*See, e.g.*, '048 Patent, cl. 4.) *See Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008) ("Different claim terms are presumed to have different meanings.").

"Data transferor" is similar to terms that the Federal Circuit has found to be means-plus-function. For example, in *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341 (Fed. Cir. 2016), the Federal Circuit concluded that "symbol generator" was means-plus-function, calling it "an abstraction that describes the function being performed (*i.e.*, the generation of symbols)." *Id.* at 1348. And in *Fintiv, Inc. v. PayPal Holdings, Inc.*, 134 F.4th 1377 (Fed. Cir. 2025), the Federal Circuit found "payment handler" to be means-plus-function because it was "simply a generic description of software or hardware that performs a specified function." *Id.* at

3

1382.  In each case, the patentee added the suffix "-or" or "-er" to a verb to create a nonce, *i.e.*, a generic component that performs that verb, thus invoking 35 U.S.C. § 112 ¶ 6.

The same is true here.  The applicants created the term "data transferor"—suffixing "-or" to "transfer"—to connote a generic component that transfers data.  *Cf. Realtime Data LLC v. Acronis, Inc.*, No. 1:17-CV-11279-IT, 2021 WL 11749802, at *11 (D. Mass. Dec. 21, 2021) ("'[D]ata accelerator' is a nonce word that requires means-plus-function analysis.").  The absence of "transferor" from the specification confirms the patentee coined it purely for claim drafting and that it has no structural meaning to a POSITA.  (Subramanian Decl. ¶¶ 52–55.)

Accordingly, "data transferor" is means-plus-function.

### b)    This limitation is indefinite because the specification does not disclose adequate structure.

A means-plus-function term is indefinite if the specification fails to disclose adequate structure to perform the claimed functions.  *Digit. Retail Apps, Inc. v. H-E-B, LP*, No. 6-19-CV-00167-ADA, 2020 WL 376664, at *3 (W.D. Tex. Jan. 23, 2020) (citing *Williamson*, 792 F.3d at 1351–52).  For definiteness, a POSITA must be able "to recognize the structure in the specification and associate it with the corresponding function in the claim."  *Id.*

The data transferor's recited function is to transfer data to a plurality of different memory locations so that a copy of the data is stored in each location.  (Subramanian Decl. ¶¶ 52–54.) But the specification never discusses such a "data transferor," nor does it identify any structure for accomplishing the data transfer function.  (*Id.* ¶ 55.)  The specification's disclosures instead mirror the claims' functional recitations.  (*See, e.g.*, '048 Patent, 3:16–19 ("control means is adapted to transmit a predetermined data unit to the memory such that the predetermined data unit is stored in the first part of the memory and the predetermined data unit is stored in the second part of the memory"), 5:2–6 ("data transfer means configured to transfer a predetermined

4

data unit received at the data input to a plurality of different memory locations in said memory so that a copy of said predetermined data unit is stored in each of said different memory locations").)

The specification discloses a "data bus," but that is not the corresponding structure. Although the specification discloses that data is transferred to the memories over a "data bus," a data bus is insufficient to perform the claimed transfer function. ('048 Patent, 8:62–9:8; Subramanian Decl. ¶ 56.) A bus is just a channel for data. (Subramanian Decl. ¶ 56.) A bus alone is incapable of transferring data to intended memory locations, just as a road is incapable of shipping packages to intended recipients. (*Id.*) Some separate structure that drives data onto the bus and provides addressing information for the intended memory locations would be necessary to implement the recited data transfer function. (*Id.*) The express recitation of a "data bus" in other claims of the '048 Patent, such as claim 4, confirms that a "data transferor" is distinct from a data bus. *See Bd. of Regents*, 533 F.3d at 1371.

That a data bus is just a conduit for data transfer—not the "data transferor" itself—is further evidenced by claim 14 of the '578 Patent (discussed below). That claim states that a "memory interface block" (akin to the "data transferor") performs the recited data transfer function "via . . . at least one data bus." ('578 Patent, cl. 14.) Thus, the patentee explicitly distinguished the unit that performs data transfer from the data bus over which transfer occurs.

Because a POSITA would be "unable to recognize the structure in the specification and associate it with the corresponding function in the claim," the term "data transferor" is indefinite. *See Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1303 (Fed. Cir. 2018) ("cheque standby unit" indefinite because specification disclosed no corresponding structure).

B.    **U.S. Patent No. 7,805,578**

1.    **"a memory interface block" ('578 Patent, claim 14)**

| Mila's Construction | NVIDIA's Construction |
|---|---|
| No construction necessary | This term is subject to 112 ¶ 6.<br><br>Function: "a memory interface block configured to transfer a predetermined data unit received at said data input from said array controller to a plurality of different memory locations in said memory via said at least one data bus so that a copy of said predetermined data unit is stored in each of said plurality of different memory locations to substantially simultaneously and to at least partially control said memory to transfer data from said memory to one or more of said plurality of processor units"<br><br>Structure: No corresponding structure (indefinite) |

a)    **This limitation is means-plus-function.**

Claim 14 of the '578 Patent recites a "memory interface block" that performs substantially the same function as recited for the "data transferor" in claims 29 and 40 of the related '048 Patent, along with additional functions. Like the "data transferor," this "memory interface block" is one of several components of a "memory interface." (*Compare* '048 Patent, cls. 29, 40, preambles *with* '578 Patent, cl. 14, preamble.)

A POSITA would not have understood "memory interface block" to be a sufficiently definite structure. (*See* Subramanian Decl. ¶¶ 59–60.) "Block" is a nonce term like "module" that conveys no structure to a POSITA. (*Id.* ¶ 60.) *See Williamson*, 792 F.3d at 1350. The words "memory interface" add no structural meaning and instead just *name* the block so that other claims (e.g., '578 claim 17) can reference it. (Subramanian Decl. ¶ 60.)

6

The term "memory interface block" cannot *be* a memory interface, for two reasons. (*See id.* ¶¶ 62–63.) First, claim 14 says that the memory interface block is one of several *components* of the claimed memory interface. (*See* '578 Patent, cl. 14 ("said memory interface comprising: . . . a memory interface block").) If "memory interface block" were construed to refer to a memory interface, then claim 14 would recite a memory interface comprising a memory interface, which is nonsensical. Such a construction would also contravene the rule that "[d]ifferent claim terms are presumed to have different meanings," as a "memory interface block" is presumably different from a "memory interface." *Bd. of Regents*, 533 F.3d at 1371.

Second, the '578 Patent's title ("Data Processor Apparatus and Memory Interface") and its specification both indicate that the invention is directed to a *novel* memory interface. (*See, e.g.*, '578 Patent, 3:26–53 (Summary of the Invention discussing purportedly inventive functionality of the memory interface).) But the only recited components of claim 14's "memory interface" are a "data input" and a "data output"—both plainly non-inventive—and the "memory interface block" at issue. Thus, interpreting "memory interface block" to mean a known (and thus non-inventive) structure for a memory interface would conflict with the '578 Patent's teachings that the invention is a novel memory interface and leave claim 14 with no structural components other than what was known in the prior art.

Because "memory interface block" connotes no structure to a POSITA, it is therefore subject to § 112 ¶ 6.

> **b)      This limitation is indefinite because the specification does not disclose adequate structure.**

The specification does not disclose any structure that performs the functions recited for the "memory interface block." The first function is substantially the same as the data transfer function recited for "data transferor" in the '048 Patent, with an additional requirement that the

transfer must occur "substantially simultaneously." (*See* '578 Patent, 19:12–17, 19:25–29.)  As discussed above for "data transferor," the specification discloses no structure for performing this function—simultaneously or otherwise—and a data bus is insufficient to perform the function. (Subramanian Decl. ¶¶ 64–65.)

The '578 Patent itself confirms that the memory interface block is distinct from the data bus.  Figure 2 (annotated above) shows that the memory interface block (orange) is *connected to* the data bus (pink).  (*See* '578 Patent, Fig. 2, 6:10–22.)  Consistent with the figure, claim 14's memory interface block transmits data "via . . . at least one data bus."  Thus, the data bus is just a conduit for the data transfer, not the unit that implements the transfer.  (Subramanian Decl. ¶ 65.)

Additionally, the specification fails to disclose sufficient structure for performing the second recited function—"at least partially control[ling] said memory to transfer data from said memory to one or more of said plurality of processing units."  ('578 Patent, 19:19–21; *see* Subramanian Decl. ¶ 66.)  While the specification discloses that a controller can perform this function, the memory interface block cannot be a controller.  ('578 Patent, 3:7–10.)  Claim 19 recites that the memory interface block receives data from—and thus is distinct from—the controller.  (*Id.*, 19:12–14.)  Consistently, Figure 2 shows that the controller (red) is distinct from the memory interface block (orange).  (*Id.*, Fig. 2, 6:10–22.)

Because the specification does not disclose sufficient structure for performing the functions of the memory interface block, claim 14 of the '578 Patent is indefinite.

### C.    U.S. Patent No. 7,924,296

The '296 Patent is directed to a system for processing and blending image data from multiple source images.  ('296 Patent, Abstract.)  The patent's Background explains that because source images are "very sizable," prior art systems incurred a high "computational and data transfer burden" and needed large, inefficient frame buffers to store intermediate processing

8

results.  (*Id.*, 1:21–24, 1:50–52.)  The patent seeks to solve those problems by using "DMA channels"—direct paths to the memory storing the source images—to break those source images into smaller, more manageable "tiles."  (*Id.*, Abstract ("The invention utilizes Direct Memory Access (DMA) fetching module for fetching image data from source images or from source image memory areas and transferring the data to another memory area without having to go through a central processing unit or display storage frame buffer. . . . The DMA channels of the DMA module will fetch a portion of the source images (tiling) utilizing a link list or series of descriptors in a certain fetching order."), 2:7–19 (similar description in Summary of the Invention).)  The tiles are then processed (*e.g.*, by scaling or color conversion), blended with other tiles, and displayed on a screen.  (*Id.*, 2:28–45, Fig. 3.)

> 1. **"wherein the plurality of image tiles are generated [from the at least one of the plurality of images] when the plurality of DMA channels perform the fetching" ('296 Patent, claims 1, 21)**[1]

| Mila's Construction | NVIDIA's Construction |
| --- | --- |
| No construction necessary | "wherein the plurality of image tiles are generated [from the at least one of the plurality of images] at the moment of the plurality of DMA channels performing the fetching" |

NVIDIA's construction sets forth this term's plain and ordinary meaning: the image tiles are generated at the same time the DMA channels perform the fetching.  *See Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1371 (Fed. Cir. 2015) (construing "when" to mean "at the moment"); *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1340 (Fed. Cir. 2011) (construing "when" to connote a cause-and-effect relationship).  Mila's position that the image

---

[1] Claim 21 adds the text in brackets.

9

tiles can be generated at any time prior to fetching is inconsistent with the claim language, specification, and prosecution history.

> **a)      The claim language as a whole supports NVIDIA's construction.**

Mila's position—that the claim merely requires that the image tiles have been generated at any point prior to the fetching—renders the specific claim language at issue meaningless and is disfavored for that reason. *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 809–10 (Fed. Cir. 2021) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous." (internal quotations omitted)); *Info-Hold*, 783 F.3d at 1373 ("Claims must be interpreted with an eye toward giving effect to all terms in the claim." (internal quotations omitted)). Both claim 1 and claim 21 contain limitations preceding the instant limitation that already require that the image tiles exist at the time of fetching. Specifically, claim 1 recites "the plurality of DMA channels fetching a plurality of image tiles of pixel data in a certain fetching order," and claim 21 recites "fetching a plurality of image tiles of pixel data in a certain fetching order by utilizing each of the plurality of DMA channels." The fetching cannot happen unless the image tiles exist.

The claim term at issue here involves an additional requirement—that "the plurality of image tiles are generated when the plurality of DMA channels perform the fetching." That requirement would add nothing to the claim if it merely reiterated the (already-inherent) requirement that the image tiles must exist in order to be fetched. Such an interpretation is "highly disfavored." *Intel*, 21 F.4th at 809–10. Instead, as proposed by NVIDIA, this claim language adds an additional requirement regarding when the image tiles are generated—they are generated when the channels perform the fetching. Thus, the plain claim language supports NVIDIA's construction.

10

### b)    The specification supports NVIDIA's construction.

The specification further supports NVIDIA's construction by stating: "The DMA channels of the DMA module will **fetch a portion of the source images** (**tiling**) utilizing a link list or series of descriptors in a certain fetching order." ('296 Patent, Abstract; *see also id.*, 2:15–18 (same), 5:32–35 (similar), 7:64–67 (similar).)  If the patentee had intended to express that a "tile" is a preexisting portion of a source image, then the noun "tile"—not the verb "tiling"—would appear in parentheses.  "Tiling" connotes the action of partitioning something into tiles, much like "grouping" and "clustering" connote the actions of organizing things into groups and clusters.  Moreover, the parentheses around "tiling" after the phrase "fetch a portion of the source images" act to equate tiling with fetching.  *See, e.g.*, *Perfect Co. v. Adaptics Ltd.*, No. C14-5976-RBL, 2019 WL 700000, at *3 (W.D. Wash. Feb. 20, 2019) (applicant "equate[d]" two terms "by putting the former in parentheses after the latter, showing that the words are intended to be used interchangeably"); *Siliconix Inc. v. Denso Corp.*, No. C 05-01507 WHA, 2006 WL 6131028, at *7 (N.D. Cal. June 8, 2006) ("inventor clearly equated" two terms "[b]y the use of [a] parenthetical).

Thus, fetching generates tiles.  That is precisely what the instant limitation means when it says that "tiles are **generated when** the plurality of DMA channels perform the fetching."  *See Am. Calcar*, 651 F.3d at 1340 (construing similar limitation containing "when" to connote cause-and-effect relationship).

### c)    The prosecution history supports NVIDIA's construction.

The prosecution history confirms NVIDIA's construction.  In response to the examiner's rejection based on the Morimoto prior-art reference, the applicants amended the claims to add the limitation at issue and distinguished Morimoto on the ground that Morimoto's tiles existed prior to fetching.  (Malloy Decl. Ex. A ("Morimoto discloses that the raw image is **already**

11

*divided prior to* the DMA channels . . . transferring the data, while ***the claims recite that plurality of image tiles are generated when the plurality of DMA channels perform the fetching***. Thus, based on the above, Morimoto fails to disclose or suggest that the plurality of image tiles are generated when the plurality of DMA channels perform the fetching.").)[2]  The applicants thus understood the disputed language to require generating tiles at the moment of fetching, and relied on that understanding to distinguish the prior art.

That understanding remains significant even though the examiner responded that the "broadest reasonable interpretation" could encompass fetching pre-existing tiles.  (Malloy Decl. Ex. A ("[I]n order for the DMA channels to fetch the image tiles, the tiles should be generated prior to the DMA fetching operation.  Therefore, the term 'when' in the above limitation is given the broadest reasonable interpretation as in the rejection above.").)  Prosecution arguments "inform the proper construction" of claim terms "regardless of whether the examiner agreed with" them.  *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011); *see also Microsoft Corp. v. Multi–Tech Sys.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) ("We have stated on numerous occasions that a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation.").  Moreover, district courts "do not assign terms their broadest reasonable interpretation."  *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 734, 740 (Fed. Cir. 2016).  "Instead, district courts seek out the correct construction—the construction that most accurately delineates the scope of the claimed invention—under the framework laid out in [*Phillips*]."  *Id.* at 740 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)).

---

[2] All emphasis to quotations herein is added unless stated otherwise.

Here, the applicants understood the claim requirement at issue the same way that NVIDIA does, in accordance with the structure of the claim and the specification: tiles are generated at the moment of fetching.  Thus, the Court should adopt NVIDIA's construction.

### D.    U.S. Patent No. 7,966,436

Figure 1



The '436 Patent is directed to a "portable communication apparatus," such as a mobile phone, with a processor, a transmitter, and a display.  ('436 Patent, 1:48–52.)  The transmitter receives data from the processor and transmits it to the display.  (*Id.*, 1:63–2:2.)  The transmitter includes a "high speed transmission unit" that sends "primary data" to the display and a "low speed transmission unit" that sends "secondary data" to the display and receives feedback data from the display.  (*Id.*)  The use of a dual-speed transmitter purportedly improves upon the prior art by providing "rapid and efficient data transmission and reception between a peripheral display device and a host processor included in a portable communication apparatus."  (*Id.*, 1:15–52.)  The '436 invention is shown in Figure 1 (above).  (*Id.*, 3:12–14, Fig. 1.)

13

> ### 1.    Preamble: "A data transmitter disposed between a data processor and a display device, the data transmitter comprising:" ('436 Patent, claim 1)

| Mila's Construction | NVIDIA's Construction |
|---|---|
| No construction necessary | The preamble is limiting. |

A preamble is limiting if "when read in the context of the entire claim, [it] recites limitations of the claim, or, if [it] is 'necessary to give life, meaning, and vitality' to the claim . . . ." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). The Federal Circuit has "repeatedly held a preamble limiting when it serves as antecedent basis for a term appearing in the body of a claim." *In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019).

That is the case here. The preamble's "a display device" is the antecedent basis for three claim terms in two limitations: (1) "a high-speed transmission unit configured to transmit a data packet obtained from the packetization unit to ***the display device*** in a high-speed mode," ('436 Patent, 12:29–31) and (2) "a low-speed transmission unit configured to relay and transmit secondary data between the data processor and ***the display device*** in a low-speed mode, and receive backward data from ***the display device*** in the low-speed mode." (*Id.*, 12:32–34.) Additionally, the preamble's "a data processor" is the antecedent basis for two claim terms: (1) "a packetization unit configured to receive primary data from ***the data processor***" (*id.*, 12:21–22; and (2) "a low-speed transmission unit configured to relay and transmit secondary data between ***the data processor*** and the display device in a low-speed mode." (*Id.*, 12:32–34.) That antecedent basis alone is sufficient reason to find the preamble limiting. *In re Fought*, 941 F.3d at 1178.

That conclusion is reinforced by the preamble's recitation of the invention's core structure. *See Proveris Sci. Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1372 (Fed. Cir. 2014)

14

("A preamble is generally construed to be limiting if it 'recites essential structure or steps' . . . that are highlighted as important by the specification."). The patent's Summary mirrors the preamble, stating that "[a]ccording to an aspect of the invention, there is provided a data transmitter disposed between a data processor and a display device." ('436 Patent, 1:60–62; *see also id.*, 6:53–55 ("The data transmitter 120 and the display device 130 should be electrically connected to each other for data communication using the physical unit 210.").) Figure 1 (provided above) consistently depicts the invention as a "portable communication apparatus" with a transmitter positioned between a processor and display device. (*Id.*, 3:12–14; Fig. 1.) That the preamble sets forth this essential arrangement is further evidence that it is limiting.

### 2.    "setting data" and "device data" ('436 Patent, claim 1)

|  | NVIDIA's Construction |
| --- | --- |
| No construction necessary | Indefinite |

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification . . . fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Claim 1 requires "setting data" to be packetized and transmitted in a high-speed mode and "device data" to be transmitted in a low-speed mode. Thus, the plain claim language establishes that setting data and device data are two different things. And as discussed above, the purportedly novel idea of the '436 Patent is to send "setting data" at high speed and "device data" at low speed.

The terms "setting data" and "device data" did not have established meanings in the art, and the specification fails to explain how one is different from the other. (Subramanian Decl. ¶¶ 68, 70–73.) For "device data," the specification provides no definition or examples at all.

15

The specification does say that "device *control* data" "includes data controlling an operation of the display device," such as "image brightness or the image size of the display device." ('436 Patent, 4:42–44, 4:60–65.) And it appears that this "device control data" may be a type of "device data," because it is transmitted at low speed. (*Id.*, 5:19–21.) But the broader term "device data" is completely undefined and presumably encompasses something more than device control data. *See Mobile Motherboard Inc. v. Asustek Comput. Inc.*, No. WA-23-CV-00325-KC, 2024 WL 457818, at *11 (W.D. Tex. Feb. 5, 2024), *report and recommendation adopted*, No. WA-23-CV-325-KC, 2024 WL 717045 (W.D. Tex. Feb. 21, 2024) (citing *InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324, 1325 n.1 (Fed. Cir. 2012)) ("Generally, adding a modifier such as an adjective to a general term that is a noun narrows the scope of the general term."). The specification provides no insight into what that something more might be. This alone supports a finding that "device data" is indefinite.

Making matters worse, the specification inconsistently lists brightness as an example of setting data after it lists brightness as an example of device control data. ('436 Patent, 8:40–45.) Is brightness "device control data"—a type of "device data" to be sent at low speed—or is it "setting data" to be sent at high speed? The patent provides no answer.

Relatedly, the specification inconsistently lists resolution as an example of setting data after it lists image size as an example of device control data. These terms, which are often used interchangeably, describe the number of pixels in a screen area. (Subramanian Decl. ¶ 74.) Even if some technical distinction could be drawn between the terms, the specification provides no rationale for categorizing them as "device control data" or "setting data."

The confusion does not end there. The specification also says that high-speed versus low-speed transmission depends on "data size." ('436 Patent, 3:1–8.) But it does not discuss the

16

relative sizes of "device data" and "setting data," nor does it say what data sizes are suitable for high-speed and low-speed transmission. All this makes it impossible to determine whether any given data should be deemed "device data" or "setting data." (Subramanian Decl. ¶ 75.)

This problem infects the heart of the '436 Patent, as the purported point of novelty is transmitting certain types of data (*e.g.*, "setting data") at high speed and other types of data (*e.g.*, "device data") at low speed. (*See* '436 Patent, 1:15–52.) Because the specification fails to delineate the scope of "setting data" and "device data" with reasonable clarity, those terms should be found indefinite.

### 3. "a low-speed transmission unit configured to relay and transmit . . . and receive . . . data" ('436 Patent, claim 1)

| Mila's Construction | NVIDIA's Construction |
|---|---|
| No construction necessary | Indefinite |

#### a) This limitation is means-plus-function.

A POSITA would have understood this limitation in the context of the '436 Patent to refer to a functional module that relays, transmits, and receives data at low speed. (Subramanian Decl. ¶¶ 77–80.) The term "transmission unit" lacked a structural meaning to POSITAs at the time of the application for the '436 Patent. (*Id.* ¶¶ 78–79.) The nonce word "unit" does not specify a structure. (*Id.* ¶ 78.) *See Diebold*, 899 F.3d at 1298 ("cheque standby unit" means-plus-function). The word "transmission" does not add structural meaning. (Subramanian Decl. ¶¶ 78–79.) *See Orange Elec. Co. v. Autel Intelligent Tech., Corp.*, No. 2:21-CV-00240-JRG, 2023 WL 300137, at *5 (E.D. Tex. Jan. 18, 2023) ("'transmitter module' must be considered a means-plus-function limitation."). The addition of the requirement that the unit be "configured to" perform a function (here, relaying and transmitting) does not change the analysis. *See MTD*

17

*Prods. Inc. v. Iancu*, 933 F.3d 1336, 1345 (Fed. Cir. 2019) ("'mechanical control assembly . . .

configured to' perform certain functions . . . is governed by § 112, ¶ 6.").

> **b)      This limitation is indefinite because the specification does not disclose adequate structure.**

The present limitation is indefinite because the specification does not provide a

supporting structural disclosure. *See Digit. Retail Apps*, 2020 WL 376664, at *3. Claim 1

recites three functions performed by the transmission unit—relaying, transmitting, and receiving

data—but the specification discloses no structure that performs any of those functions.

(Subramanian Decl. ¶ 81.) Rather, like the claim language itself, the specification merely

attributes those functions to the transmission unit. (*See, e.g.*, '436 Patent, 2:22–25 ("The low-

speed transmission unit may receive the secondary data in the low-speed mode from the display

device . . . ."), 8:60–67 ("The low-speed transmission unit 320 not only receives only the device

data from the APB controller 330 and transmits the received device data to the display device

(forward), but also receives the backward data from the display device 130 (backward).

Accordingly, the low-speed transmission unit 320 performs a function of bi-directionally

relaying data in the low-speed mode."), 9:12–18 (similar).)

While the specification does mention that data is converted from digital to analog using a

clock signal before it is transmitted, that does not provide sufficient structure—even for the

"transmitting" function. ('436 Patent, 6:35–40; Subramanian Decl. ¶ 82.) As Dr. Vivek

Subramanian explains, "[s]ome type of undisclosed analog circuitry would be needed to relay

and transmit the analog signals created by the" digital-to-analog converter (DAC).

(Subramanian Decl. ¶ 82.) Moreover, this disclosure has no bearing on the transmission unit's

*receiving* function, for which the specification provides no technical discussion at all. (*Id.*)

Because the specification does not disclose adequate structure for the "transmission unit" limitation, it is indefinite.

### E.    U.S. Patent No. 8,151,136

The '136 Patent is directed to a system comprising multiple processors—including a main processor and application processor—and more particularly to the way in which the application processor boots up. ('136 Patent, Abstract.) The specification explains that in prior-art systems, the main processor transferred boot code directly to the application processor via a bus. (*See id.*, 3:11–39.) The specification identifies two problems with this approach. First, "the main processor . . . must read and transfer the large data" to the application processor. (*Id.*, 3:16–18.) Second, there was no "structure[] to check for an error" in the boot code. (*Id.*, 3:42–45.)

The patented invention purportedly solves these problems in two ways. First, the main processor sends the application processor bootup ***control*** commands instead of boot code. (*Id.*, 4:57–60 ("a main processor, being coupled to at least one application processor and ***controlling an operation of the application processor*** . . . ."), 11:54–55 ("The main processor 210 can send a ***booting command*** to the application processor 215 . . . .").) The application processor then reads the boot code from a memory that it shares with the main processor. (*Id.*, 4:55–56.)

Second, the main processor checks for errors in the application processor's boot code. (*Id.*, 3:25–32.) If it finds an error, then the main processor either corrects the error and writes the error-corrected code into the shared memory or loads a backup copy of the code and writes that copy into the shared memory. (*Id.*, 4:1–7, 4:14–30, Abstract.) The specification also mentions an alternative embodiment in which the application processor itself (instead of the main processor) performs this error handling process. (*Id.*, 5:17–32, 12:6–14.)

19

The patented invention is shown in Figure 3 (below).  Box 210 is the main processor, box 215 is the application processor, and box 320 is the shared memory.



Figure 3

1.      Preambles: "A main processor, being coupled to at least one application processor and controlling an operation of the application processor, the main processor comprising:" ('136 Patent, claim 9) / "A code data error correcting method by a main processor included in a digital processing device, the device comprising a main processor and at least one application processor, the method comprising:" ('136 Patent, claim 20)

| Mila's Construction | NVIDIA's Construction |
|---|---|
| No construction necessary | The preambles are limiting. |

The preambles of claims 9 and 20 are limiting for several reasons.  First, the preambles' "a main processor" is the antecedent basis for limitations on "the main processor" in the body of the claims.  ('136 Patent, cl. 9 ("wherein the shared memory has two or more ports, and one of

20

the ports is assigned to ***the main processor***"); *id.*, cl. 20 ("wherein the nonvolatile memory is coupled to ***the main processor*** through an MP-NM bus, and the shared memory is shared by ***the main processor*** and the application processor; . . . wherein the shared memory has two or more ports, and one of the ports is assigned ***to the main processor***").)  *See In re Fought*, 941 F.3d at 1178 (preamble limiting if it provides the antecedent basis for limitations in the claim body).

Second, the preambles recite important disclosures in the specification.  *See Proveris*, 739 F.3d at 1372–73 (preamble phrase "sequential set of images" limiting where specification taught the invention produced a sequential set of images); *Poly-Am. L.P. v. GSE Lining Tech. Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (preamble limiting because it disclosed a "fundamental characteristic of the claimed invention").  In claim 9, the preamble's recitation that the main processor ***controls*** the application processor serves to contrast the invention with prior-art systems in which the main processor sent bootup code directly to the application processor. (*See* '136 Patent, 3:11–60.)  In claim 20, the preamble's statement that the main processor performs error correction reflects teachings in the patent's Abstract and Summary.  (*See, e.g., id.*, Abstract ("A main processor included in a digital processing device in accordance with an embodiment of the present invention writes in a shared memory third code data error-corrected by a predetermined error correcting method or second code data written in a backup area if there is an error in first code data written in a code data area of a nonvolatile memory."), 4:1–30.)

Third, the language of the preambles varies and distinguishes different claims from each other.  *See, e.g., Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005) ("common sense" "that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope").  The preamble of claim 9 recites that "***the main processor*** compris[es]" a controller that performs error handling, and the

21

preamble of claim 20 recites an "error correcting method by a main processor[.]" This is the specification's primary embodiment. (*See, e.g.*, *id.*, Abstract, 4:1–7, 4:14–30.) By contrast, the preamble of claim 16 recites that "***the application processor*** compris[es]" a controller that performs error handling. This is the specification's alternative embodiment. (*See id.*, 5:17–32, 12:6–14.) The patentee used this different language in the preambles to distinguish between those two embodiments, which only makes sense if the preambles are limiting. *See Novartis Pharms. Corp. v. Accord Healthcare Inc.*, 387 F. Supp. 3d 429, 437 (D. Del. 2019) (applying claim differentiation to find preambles limiting).

### F.    U.S. Patent No. 8,275,975

The '975 Patent is directed to a "sequencer" for controlling distributed functional units on a system-on-chip ("SoC"). ('975 Patent, Abstract.) The sequencer uses counters to monitor available system resources, including memory, transfer channels, and processing power. (*Id.*, 5:50–57.) When the sequencer triggers the start of an operation in a particular functional unit, it decrements the counters for the resources used by that functional unit. (*Id.*, 2:35–45.) By offloading control tasks to the sequencer, the purported invention relieves the main processor of the need to control the SoC's functional units. (*Id.*, 3:34–36.)

#### 1.    Preamble: "A sequencer controlled system for a system-on-chip (SoC) integrated circuit design, comprising:" ('975 Patent, claim 1)

| Mila's Construction | NVIDIA's Construction |
|---|---|
| No construction necessary | The preamble is limiting. |

The preamble of claim 1 is limiting for several first reasons. First, it provides an antecedent basis for the term "said SoC" in the body of claim 1. "[S]aid SoC" is not described anywhere else in the claim. This alone makes the preamble limiting. *See In re Fought*, 941 F.3d at 1178.

Second, the preamble recites structure that the specification characterizes as important. *See Proveris*, 739 F.3d at 1372-73; *Poly-Am.*, 383 F.3d at 1310. The specification repeatedly highlights the importance of SoC designs and emphasizes their advantages over prior art systems. (*See, e.g.*, '975 Patent, 1:39–40 ("The invention proposes a simple method for controlling distributed functional units (FU) in an SoC system."), 2:12–14 ("A more specific object of the present invention is to provide a sequencer controlled system for a system-on-chip (SoC) integrated circuit design."), 1:29–37 ("The SoC provides many advantages over traditional processor-based designs . . . [and] is also an attractive alternative to fully customized chips.").) Construing the preamble as limiting correctly provides the claim with this essential context.

Third, the applicants for the '975 Patent relied on the preamble to distinguish prior art. *See In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1348 (Fed. Cir. 2002) (finding preamble phrase limiting because the patentee explicitly pointed to the preamble during reexamination to differentiate prior art). Specifically, in response to the Examiner's obviousness rejection, the applicants argued that prior art lacking an SoC environment "fail[s] to disclose or suggest a sequencer controlled system for a system-on-chip (SoC) integrated circuit design." (Malloy Decl. Ex. B.) This "indicates use of the preamble to define, in part, the claimed invention" and thus makes the preamble a claim limitation. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

23

> **2.     "the status information consisting of available direct memory access (DMA) transfer channels and others selected from the group consisting of processes running on said SoC, available memory area for storage, and available processing power" ('975 Patent, claim 1)**

| Mila's Construction | NVIDIA's Construction |
|---|---|
| No construction necessary | "the status information limited to available direct memory access (DMA) transfer channels and others selected from among the following three items: processes [running on said SoC], available memory area for storage, and available processing power" |

Claims 1 and 18 recite a sequencer that monitors "status information" of resources to control the start of an operation in a hardware functional unit.  The applicant amended the claimed "status information" during prosecution to overcome prior art by adding the phrase "*consisting of*"—patent parlance invoked to change claim scope from an open-ended group to an exclusive one.  *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1358 (Fed. Cir. 2016) (holding that "consisting of" creates "a very strong presumption that that claim element is 'closed' and therefore 'exclude[s] any elements, steps, or ingredients not specified in the claim'" (quoting *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1245 (Fed. Cir. 2001))).  Here, the patentees twice invoked the "*consisting of*" phrase to limit the claimed "status information" to only (1) "available direct memory access (DMA) transfer channels"; and (2) "others selected from among the following three items: processes [running on said SoC], available memory area for storage, available processing power."

### a)     "Consisting of" excludes unrecited information.

The phrase "consisting of" has a "distinct and well-established meaning" in patent law.  *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1358 (Fed. Cir. 2016).  It "creates a very strong presumption that [a] claim element is 'closed' and therefore

24

'excludes any elements, steps, or ingredients not specified in the claim.'" *Id.* (quoting *AFG Indus., Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239, 1245 (Fed. Cir. 2001) (alterations omitted)).

Here, claims 1 and 18 recite status information "consisting of": (1) available DMA transfer channels, and (2) "others" selected from "processes [running on said SoC], available memory area for storage, and available processing power." The closed nature of "consisting of" means that a sequencer that uses any unrecited types of status information is outside the scope of the claims, even if that sequencer does use the recited types of status information. *See Multilayer Stretch*, 831 F.3d at 1358; *Int'l Biomedical, Ltd. v. Gen. Elec. Co.*, No. 1-14-CV-397-LY, 2015 WL 7431408, at *8 (W.D. Tex. Nov. 20, 2015) (construing claim reciting a "geometric shape selected from the group consisting of an ellipsoid, a paraboloid and a hyperboloid" to require one of the three listed shapes "and no other shape"); *Ravgen, Inc. v. Natera, Inc.*, No. 1:20-CV-00692-ADA, 2021 WL 9349178, at *1, *4 (W.D. Tex. Nov. 8, 2021) (limiting agent "select[ed] from the group consisting of membrane stabilizer, cross-linker and cell lysis inhibitor" to listed elements and excluding substances referenced only in the specification).

### b)     The specification supports a construction that excludes unrecited information.

There is no disclosure in the '975 Patent to displace this presumption of a closed grouping of claim elements. In *Multilayer Stretch*, the Federal Circuit held that a claim grouping "consisting of" four resins "must be construed as closed to resins other than [the four resins listed in the claim]." 831 F.3d at 1358. This was so even though the specification "describe[d] several other types of resin as suitable for incorporation." *Id.* at 1359–60 ("We do not think that the listing of these other resins in the specification is sufficient to overcome the presumption created by the 'consisting of' claim language.").

In contrast to the specification in *Multilayer Stretch*, the '975 Patent merely refers to "any other processes for the SoC chip" as a possible type of status information, without further explanation.  (*See* '975 Patent, 5:50–57 ("The resource refers to numeric values which represent processes running on the SoC chip, the available storage memory, the transfer channels, the available processing power, *or any other processes for the SoC chip*.").)  Nothing in the '975 Patent overcomes the exceptionally strong presumption that "status information" should be limited to the elements recited in claims 1 and 18.

> **c)**    **The patentee deliberately limited the term's scope during prosecution.**

"[T]o overcome the exceptionally strong presumption that a claim term set off with 'consisting of' is closed to unrecited elements, the . . . prosecution history must unmistakably manifest an alternative meaning."  *Multilayer Stretch*, 831 F.3d at 1359.  It does not do so here.  Rather, the prosecution history reinforces the conclusion that the patentee intended to limit "status information" to the elements explicitly recited in claims 1 and 18.

During prosecution, the Examiner rejected the claims as obvious over prior art that disclosed a sequencer that tracked multiple types of status information:

> ***Panwar discloses*** of [sic] ***a sequencer*** (e.g. col. 10, line 4, pipeline tracking unit 218) further ***having a plurality of resources*** (Figure 4, the counters 402-408 inside pipeline tracking unit 218, referenced in col. 9, line 59 and col. 10, lines 15-19) ***associated with numeric values which represent status information*** (col. 9, lines 66-67, live instruction counter 402 reflects a number of resources remaining; col. 10, lines 15-19, the counters track available resources), ***the status information including at least one selected from the group consisting of processes running on a system, available memory***

26

> *area for storage, available transfer channels, and available*
>
> *processing power* (e.g. see col. 10, lines 18-19 . . .)

(Malloy Decl. Ex. B).  In response, the applicant amended the "status information" limitation by substituting the open-ended phrase "at least one" with "consisting of" to limit the claim to the specifically recited grouping of "status information":

> a sequencer having a set of registers, said registers being configured to control ~~a timing~~ the start of at least one operation of said plurality of hardware functional units with stored instructions for each of said plurality of hardware functional units, said sequencer further having a plurality of resources associated with numeric values which represent status information, the status information ~~including at least one~~ consisting of available DMA transfer channels and others selected from the group consisting of processes running on said SoC, available memory area for storage, ~~available transfer channels,~~ and available processing power,

(*Id.*)

The prosecution history thus further clarifies that "status information" should be construed as a closed group consisting of "available direct memory access (DMA) transfer channels" and others selected from among the following three items: "processes [running on said SoC], available memory area for storage, and available processing power."  *See Azurity Pharms., Inc. v. Alkem Lab'ys Ltd.*, 133 F.4th 1359, 1367 (Fed. Cir. 2025) (finding that the addition of "consisting of" to the claims during prosecution to overcome a prior art rejection "limits the claim's scope to the recited components").

### 3.    "embedded processor" ('975 Patent, claim 1)

| Mila's Construction | NVIDIA's Construction |
|---|---|
| No construction necessary | "A processor on said SoC" |

Claim 1 recites a "sequencer controlled system for a *system-on-chip (SoC)* integrated circuit design, *comprising* . . . an *embedded processor*[.]"  "Embedded processor" should be

27

construed to mean "a processor on said SoC."  Mila seems to disagree and contend that an "embedded processor" can be another chip separate from the SoC.

The plain claim language supports NVIDIA's construction.  First, NVIDIA's construction affords meaning to "embedded," whereas construing it to allow for an off-chip processor would render it superfluous.  *See Intel*, 21 F.4th at 810 (superfluous construction "highly disfavored").  Second, NVIDIA's construction correctly recognizes that the "embedded processor" of claim 1 is presumably different from the "external processor" of claim 18.  *See Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012) (different terms presumed to have different meanings).

The specification strongly supports NVIDIA's construction.  It repeatedly describes the processor as "integrated" in the SoC.  ('975 Patent, 3:29-33 ("FIG. 1 is a diagram of an exemplary system 100 embodying the teachings of the present invention.  System 100 advantageously *integrates* the functionality of a general purpose microprocessor based computer system[.]"), 5:43–47 ("The principles of the present invention advantageously allow for selective control of functional units *within a single chip integrated circuit device* without burden on the main embedded processor.").)

Accordingly, the Court should adopt NVIDIA's construction of "embedded processor."

### 4.    "third hardware functional unit" ('975 Patent, claim 5)

| Mila's Construction | NVIDIA's Construction |
| --- | --- |
| No construction necessary | Indefinite. |

Claim 5 of the '975 Patent depends on claim 1 and recites a "plurality of hardware functional units compris[ing] a *third hardware functional unit*."  But neither claim 1 nor claim 5 recites a first or second hardware unit.  There is no way to identify a third unit in the absence of a

28

first or a second.  While claims 3 and 4 do recite "first" and "second hardware functional units," claim 5 does not depend on those claims.  ('975 Patent, cls. 3–4.)  Thus, they cannot be used to supply the missing first and second units needed for claim 5.  The specification does not cure this problem, as it does not use the term "third functional unit" or discuss a three-unit embodiment.

Because neither the claims nor the specification provides reasonable certainty as to the scope of the "third hardware functional unit," it is indefinite.  (Subramanian Decl. ¶¶ 84–87.) *See Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364 (Fed. Cir. 2012) (finding "control device" indefinite because it could have been one of "at least three different types of control devices commonly available and used at the time").

## III. CONCLUSION

NVIDIA's constructions correctly resolve the parties' claim construction disputes consistent with Federal Circuit precedent.  Mila wrongly seeks to punt these disputes to the jury by not offering constructions.  Accordingly, the Court should adopt NVIDIA's constructions.

29

Dated: April 16, 2026                    MORRISON & FOERSTER LLP


By: */s/ Brian C. Nash*

    Brian C. Nash (TX Bar No. 24051103)
    MORRISON & FOERSTER LLP
    300 Colorado Street, Suite 1800
    Austin, TX 78701
    Tel.: (512) 617-0654
    BNash@mofo.com

    Daralyn J. Durie (admitted *pro hac vice*)
    MORRISON & FOERSTER LLP
    425 Market Street
    San Francisco, CA 94105-2482
    Tel.: (415) 268-7000
    Fax: (415) 268-7522
    DDurie@mofo.com

    Ryan Malloy (admitted *pro hac vice*)
    MORRISON & FOERSTER LLP
    707 Wilshire Boulevard
    Los Angeles, CA 90017
    Tel.: (213) 892-5200
    RMalloy@mofo.com

    Matthew R. Stephens (TX Bar No. 24129261)
    MORRISON & FOERSTER LLP
    12531 High Bluff Drive, Suite 100
    San Diego, CA 92130
    Tel.: (858) 720-5100
    Fax: (858) 720-5125
    MStephens@mofo.com

    ***Counsel for Defendant***
    ***NVIDIA CORPORATION***

30

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on April 16, 2026, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

_/s/ Brian C. Nash_
Brian C. Nash
