## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

MILA US INC,

                    Plaintiff,

        v.

NVIDIA CORPORATION,

                    Defendant.

Case No.  1:25-cv-01359-ADA

**JURY TRIAL DEMANDED**

**<u>PLAINTIFF'S RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

**TABLE OF CONTENTS**

I.  INTRODUCTION ...........................................................................................................1

II.  U.S. PATENT NO. 7,757,048 DISPUTED TERMS..........................................................1

    A.  "data transferor", ('048 Patent, Claims 29, 40) ...............................................1

III.  U.S. PATENT NO. 7,805,578 PATENT DISPUTED TERMS ...........................................1

    A.  "a memory interface block" ('578 Patent, Claim 14) ......................................1

        i.  The Term "Memory Interface Block" Does Not Invoke § 112, ¶ 6 ..........................2

        ii.  The Claims Detail The Structural Nature Of The Term ...........................................2

        iii. The '578 Patent Specification Confirms That The "Memory Interface Block" Has Structural Meaning ..........................................................................................4

        iv.  The Term "Memory Interface Block" Is Not Indefinite ...........................................6

IV.  U.S. PATENT NO. 7,924,296 DISPUTED TERMS..........................................................8

    A.  "wherein the plurality of image tiles are generated when the plurality of DMA channels perform the fetching" ('296 Patent, Claims 1, 21)..........................................8

V.  U.S. PATENT NO. 7,966,436 DISPUTED TERMS..........................................................12

    A.  Preamble: "A data transmitter disposed between a data processor and a display device, the data transmitter comprising:"  ('436 Patent, Claim 1)...............................12

    B.  "setting data" and "device data" ...................................................................15

        i.  Claim 1 provides meaningful guidance .................................................................15

        ii.  "Setting data" and "device data" are not indefinite based on the teachings of the specification ..........................................................................................................16

        iii. NVIDIA's arguments are unpersuasive .................................................................17

    C.  "a low-speed transmission unit configured to relay and transmit … and receive … data"..........................................................................................................................19

        i.  The Term Does Not Invoke 35 U.S.C. § 112 ¶ 6......................................................20

ii.  The Claims Detail The Structural Nature Of The Term .........................................21

iii. The '436 Patent Specification And Prosecution History Confirm That The "Low-Speed Transmission Unit" Has Structural Meaning .................................................22

iv.  The Term "Low-Speed Transmission Unit" Is Not Indefinite................................24

VI.   U.S. PATENT NO. 8,151,136 DISPUTED TERMS...........................................................24

A.   Preamble: "A main processor, being coupled to at least one application processor and controlling an operation of the application processor, the main processor comprising:" ('136 Patent, Claim 9)...........................................................................25

B.   "A code data error correcting method by a main processor included in a digital processing device, the device comprising a main processor and at least one application processor, the method comprising:" ('136 Patent, Claim 20)...................26

VII.  U.S. PATENT NO. 8,275,975 DISPUTED TERMS...........................................................27

A.   Preamble: "A sequencer controlled system for a system-on-chip (SoC) integrated circuit design, comprising:" ('975 Patent, Claim 1) ......................................................27

B.   "Consisting of…", ('975 Patent, Claims 1, 18) ............................................................28

i.   "Consisting of" does not exclude other categories of "status information" .............29

ii.  NVIDIA's construction improperly excludes preferred embodiments.....................31

iii. The patentee did not limit the scope of the claim during prosecution ......................31

C.   "Embedded processor," ('975 Patent, Claim 1)............................................................32

D.   "Third hardware functional unit," ('975 Patent, Claim 5) ...........................................34

VIII. CONCLUSION.....................................................................................................................35

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
618 F.3d 1354 (Fed. Cir. 2010)........................................................................................ 14

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
637 F.3d 1324 (Fed. Cir. 2011)........................................................................................ 10

*Amgen Inc. v. Amneal Pharms. LLC*,
945 F.3d 1368 (Fed. Cir. 2020)........................................................................................ 30

*Apex Inc. v. Raritan Computer, Inc.*,
325 F.3d 1364 (Fed. Cir. 2003).......................................................................................... 5

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
672 F.3d 1335 (Fed. Cir. 2012)........................................................................................ 13

*Azurity Pharms., Inc. v. Alkem Lab'ys Ltd.*,
133 F.4th 1359 (Fed. Cir. 2025) ...................................................................................... 32

*BE Labs, Inc. v. Ubiquiti Inc.*,
No. 24 CIV. 3643 (LGS), 2026 WL 114830 (S.D.N.Y. Jan. 15, 2026) ................................... 10

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
289 F.3d 801 (Fed. Cir. 2002)................................................................................ 12, 14, 27, 28

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
438 F.3d 1374 (Fed. Cir. 2006)........................................................................................ 34

*Dyfan, LLC v. Target Corp.*,
28 F.4th 1360 (Fed. Cir. 2022) ...................................................................................... 2, 20

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.*,
766 F.3d 1338 (Fed. Cir. 2014)........................................................................................ 31

*Galderma Lab'ys., L.P. v. Amneal Pharms. LLC*,
806 F. App'x 1007 (Fed. Cir. 2020) .................................................................................. 10

*HBCU Messaging US LP v. Apple, Inc., et. al.*,
No. 1:24-cv-1199-ADA, Dkt. No. 74 (W.D. Tex. Jan. 28, 2026) .............................................. 9

*Huawei Techs. Co. v. Verizon Commc'ns, Inc.*,
No. 2:20-CV-00030-JRG, 2021 WL 150442 (E.D. Tex. Jan. 15, 2021) ............................. 20, 21

*Info-Hold, Inc. v. Muzak LLC*,
    783 F.3d 1365 (Fed. Cir. 2015)...................................................................................... 12

*Inventio AG v. ThyssenKrupp Elevator Americas Corp.*,
    649 F.3d 1350 (Fed. Cir. 2011)...................................................................................... 22

*Marrin v. Griffin*,
    599 F.3d 1290 (Fed. Cir. 2010)...................................................................................... 28

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
    831 F.3d 1350 (Fed. Cir. 2016)...................................................................................... 30

*Nautilus, Inc. v. Biosig Instrus., Inc.*,
    572 U.S. 898 (2014)........................................................................................................ 15

*Niazi Licensing Corp. v. St. Jude Med. S.C., Inc.*,
    30 F.4th 1339 (Fed. Cir. 2022) ...................................................................................... 19

*Nitride Semiconductors Co. v. Lite-On Tech. Corp.*,
    No. 21-CV-00183-ADA, 2022 WL 17347782 (W.D. Tex. Nov. 30, 2022)............................ 30

*Orange Elec. Co. v. Autel Intelligent Tech., Corp.*,
    No. 2:21-CV-00240-JRG, 2023 WL 300137 (E.D. Tex. Jan. 18, 2023) ................................. 21

*Panasonic Corp. v. Magna Int'l Inc.*,
    No. 6:21-CV-319-ADA, 2022 WL 625089 (W.D. Tex. Mar. 3, 2022)............................. 13, 25

*Panoptis Pat. Mgmt., LLC v. Blackberry Ltd.*,
    No. 2:16-CV-62-JRG-RSP, 2017 WL 497571 (E.D. Tex. Feb. 7, 2017)................................. 20

*Parkervision, Inc v. LG Elecs., Inc.*,
    No. 6:21-CV-00520-ADA, 2022 WL 2240465 (W.D. Tex. June 21, 2022) ........................... 12

*Pavo Sols. LLC v. Kingston Tech. Co.*,
    35 F. 4th 1367 (Fed. Cir. 2022) ..................................................................................... 35

*Perfect Co. v. Adaptics Ltd.*,
    No. C14-5976-RBL, 2019 WL 700000 (W.D. Wash. Feb. 20, 2019).................................... 11

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
    948 F.3d 1342 (Fed. Cir. 2020)...................................................................................... 21

*Sci. Applications Int'l Corp. v. United States*,
    169 Fed. Cl. 643 (2024) ................................................................................................. 17

iv

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
    844 F.3d 1370 (Fed. Cir. 2017) ................................................................................... 15, 18

*Sonrai Memory Ltd. v. Oracle Corp.*,
    No. 1:22-CV-94-LY, 2022 WL 800730 (W.D. Tex. Mar. 16, 2022) ..................................... 2, 4

*ThroughPuter, Inc. v. Amazon Web Servs., Inc.*,
    No. 1:22-CV-1095-DAE, 2025 WL 2946606 (W.D. Tex. Sept. 9, 2025) .................................. 2

*Toshiba Corp. v. Imation Corp.*,
    681 F.3d 1358 (Fed. Cir. 2012) ........................................................................................ 8, 32

*TrackThings LLC v. Amazon.com, Inc.*,
    No. 6:21-CV-720-ADA, 2022 WL 2135009 (W.D. Tex. June 14, 2022) ............................... 21

*VLSI Tech. LLC v. Intel Corp.*,
    87 F.4th 1332 (Fed. Cir. 2023) ............................................................................................... 8

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) ............................................................................................. 22

**Statutes**

35 U.S.C. § 112 ............................................................................. 1, 2, 4, 5, 19, 20, 24

## I.    INTRODUCTION

Plaintiff Mila US Inc ("Mila") submits this responsive claim construction brief to NVIDIA

Corp.'s Opening Claim Construction Brief (Dkt. No. 39, "Br.").[1]

## II.    U.S. PATENT NO. 7,757,048 DISPUTED TERMS

### A.    "data transferor", ('048 Patent, Claims 29, 40)

In an effort to further streamline the issues in dispute, Mila will no longer pursue its claims

for infringement of claims 29 and 40 of the '048 Patent.  However, Mila's decision to drop claims

29 and 40 is not premised on and should not be interpreted as adopting NVIDIA's arguments and

reasoning concerning the term "data transferor," which Mila does not agree with.

## III.    U.S. PATENT NO. 7,805,578 PATENT DISPUTED TERMS

### A.    "a memory interface block" ('578 Patent, Claim 14)

| Mila's Proposed Construction | NVIDIA's Proposed Construction |
|---|---|
| No construction necessary.  The claim term does not invoke § 112, ¶ 6.<br><br>Alternatively, should § 112, ¶ 6 apply:<br><br>Functions:  "transfer a predetermined data unit received at said data input from said array controller to a plurality of different memory locations in said memory via said at least one data bus so that a copy of said predetermined data unit is stored in each of said plurality of different memory locations" and "transfer said predetermined data unit into said plurality of different memory locations substantially simultaneously."<br><br>Structure:  memory interface block 37 (FIGs. 2, 3, 6:10 – 7:18, 7:43-67, 9:1-14, 10:29 – | Term is subject to § 112, ¶ 6<br><br>Function: "a memory interface block configured to transfer a predetermined data unit received at said data input from said array controller to a plurality of different memory locations in said memory via said at least one data bus so that a copy of said predetermined data unit is stored in each of said plurality of different memory locations to substantially simultaneously and to at least partially control said memory to transfer data from said memory to one or more of said plurality of processor units"<br><br>Structure: No corresponding structure (indefinite) |

---

[1] Per the Court's Standing Order Governing Proceedings (OGP)—Patent Cases, NVIDIA was only permitted to seek construction of 12 terms across the 6 asserted patents.  However, by improperly combining sections for the '436 and '136 Patents, NVIDIA requests construction of 14 terms.  The Court should require NVIDIA to elect only 12 terms for construction, per the OGP.

| 11:19, 12:54 – 13:39, 14:7-31, 15:4-23, 15:33 – 16:34, 16:58-61, and 17:34-37), and/or corresponding figures and equivalents thereof. | |

i. **The Term "Memory Interface Block" Does Not Invoke § 112, ¶ 6**

The Court should reject NVIDIA's argument that the term "memory interface block" is a means-plus-function term and is indefinite. The term "memory interface block" does not include the language "means for." Accordingly, the presumption is that § 112 ¶ 6 is ***not*** invoked. *See Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022). NVIDIA bears the burden of overcoming this presumption by a preponderance of the evidence, which it cannot do. *Id*. at 1367.

NVIDIA purports that the term "block" is a "nonce term like 'module' that conveys no structure to a POSITA." Br. at 6. But the term at issue is not a "block"—the limitation at issue is a "memory interface block" and the relevant question is whether that term as a whole conveys sufficient structural meaning to a POSITA. *See ThroughPuter, Inc. v. Amazon Web Servs., Inc.*, No. 1:22-CV-1095-DAE, 2025 WL 2946606, at *5 (W.D. Tex. Sept. 9, 2025) ("the Court's task is not to assess each individual word in the disputed claim term but rather to evaluate the claim term 'as a whole.'") (citation omitted). The '578 Patent claims, specification, and prosecution history confirm that the term "memory interface block" has structural meaning.

ii. **The Claims Detail The Structural Nature Of The Term**

Claim 14 of the '578 Patent describes the "memory interface block" as a structure that interacts with other structural components to achieve the claimed functionality. *See Sonrai Memory Ltd. v. Oracle Corp.*, No. 1:22-CV-94-LY, 2022 WL 800730, at *9 (W.D. Tex. Mar. 16, 2022) ("The claims themselves connote sufficient structure by describing how the 'logic for' terms operate within the claimed invention to achieve their objectives."). Claim 14 recites a "memory interface" comprising "a data input," "a data output," "a memory interface block," and utilizes

2

certain "bus[es]."   The claim details that the "memory interface block" is (1) "configured to transfer" a "data unit" received at the "data input from [an] array controller" to "different memory locations in said memory via [] *at least one data bus*" and (2) "adapted to at least partially control" the "memory to transfer data from [the] memory to one or more of [the] plurality of processor units."[2]   In other words, the claim recites that the "memory interface block" receives "broadcast data" from an "array controller," a structure, via one "data bus," a structure, utilizes another "data bus" (also a structure) to transfer data to and from "different memory locations" in memory, a well-known structure.  '578 Patent at 1:16-17 ("A bus refers to a collection of wires through which data is transmitted from one part of a computer to another."), 2:35-36 ("[t]he memory can be a random access memory, such as DRAM"); Brogioli Decl. ¶¶ 29-30.   Further, the "memory interface block" "partially control[s]" the memory, a known structure, to transfer data to "processor units," which are also structures.  '578 Patent at 4:4-5 ("[e]ach processor unit may comprise a plurality of one bit processor elements."); Brogioli Decl. ¶¶ 29-30.  As such, claim 14 sets forth the operations and connections of the "memory interface block" in a manner connoting structure.

NVIDIA argues that construing "memory interface block" as a "memory interface" would create a nonsensical claim because claim 14 recites a "memory interface comprising . . . a memory interface block."  Br. at 7.  But Mila does not seek to construe "memory interface block" as a "memory interface."  Nor does Mila dispute that the "memory interface block" is a component of the broader "memory interface," which contains other components, such as a "data input" and "data output."  Claim 14, as written, conveys as much.  However, understanding the "memory interface block" as part of the "memory interface" does not mean that it lacks sufficient structure.[3]

---

[2] All emphasis added unless stated otherwise.
[3] NVIDIA also argues that construing "memory interface block" as a known hardware structure would render claim 14 "non-inventive" and "leave claim 14 with no structural components other

3

### iii.    The '578 Patent Specification Confirms That The "Memory Interface Block" Has Structural Meaning

The structural nature of the "memory interface block" is detailed in the '578 Patent specification.  For example, in connection with Figure 2, the '578 Patent teaches that "data processor 1 comprises a **memory interface block 37** for coupling the memory externally so that the memory can receive data from and output data to the outside world."  '578 Patent at 6:10-13.  Figure 2 then depicts "memory interface block 37" as a hardware block interfacing with "data input port 38 for receiving external data," "output port 39 for outputting data externally," "data bus 41" that is connected "to each memory input port 29, 31 for transferring data from the memory interface to the memory," "data bus 43" is connected to "the output ports 33, 35 of the memory for carrying data from the memory to the memory interface," among other physical connections:



FIG. 2

'578 Patent at 6:10-30.  As such, the '578 Patent specification details the inputs and outputs, as well as the connections, of the "memory interface block" and its interactions with other structural components.  *See* Brogioli Decl. ¶¶ 31-33; *Sonrai*, 2022 WL 800730, at *10 ("[t]he specification

---

than what was known in the prior art." Br. at 7. That argument improperly conflates claim construction with invalidity analysis. Whether claim 14 is novel or non-obvious over the prior art is a separate inquiry under §§ 102 and 103 and does not undermine determining whether "memory interface block" conveys sufficient structure under § 112 ¶ 6.

describes the functional features of the 'logic for' terms in connection with a memory controller or other logic, such as an operating system").

The '578 Patent also teaches how the "memory interface block" generates and controls certain signals in the context of the claimed functionality.  For example, the '578 Patent teaches that "[t]he memory interface block 37 is capable of generating the following signals:" ME (memory enable), WE (write enable), and BWE (byte write enable).  '578 Patent at 6:31-55.  The '578 Patent explains how these are specific control signals with defined logical values and precise operational effects on the memory segments.  *See, e.g.*, *id.* at 6:34-36 (explaining the "memory enable" "signal turns the memory on and off" and that "when ME equals 1, the memory is on, and when ME equals 0, the memory is off.").  A POSITA understands that these memory signals generated by the "memory interface block," which influence the operation of "memory," indicate the use of hardware circuitry.  Brogioli Decl. ¶ 31-34.

The '578 Patent further contemplates that "[t]he array controller and/or the memory interface may also be formed on the same integrated circuit with the memory and processor units." '578 Patent at 16:58-61, 17:34-37 (same).  An "integrated circuit" is a well-known structure and the fact that the "memory interface" may be formed as part of an "integrated circuit" further underscores that a POSITA would recognize the "memory interface block" as hardware circuitry.  Brogioli Decl. at ¶¶ 31-34, 36; *see also Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1374–75 (Fed. Cir. 2003) (rejecting "interface circuit" was subject to § 112, ¶ 6 and explaining "[t]he term 'interface circuit' means any circuit that links one type of logic system with another.").

Finally, the prosecution history further confirms that the "memory interface block" has structural meaning.  Neither the Examiner nor the Applicant ever contended that the "memory interface block" was subject to §112(6).  *See* Brogioli Decl. at ¶ 35.

5

### iv.    The Term "Memory Interface Block" Is Not Indefinite

Should the Court find the presumption *against* 112(6) is overcome, the Court must next consider whether NVIDIA can prove by clear and convincing evidence that the claims are indefinite for lack of corresponding structure.  NVIDIA cannot meet its burden in light of the specification's extensive descriptions of the corresponding structure for the "memory interface block," as detailed above and as identified by Dr. Brogioli.  Brogioli Decl. ¶¶ 31-34, 36, 38.

NVIDIA is wrong that the "specification does not disclose any structure that performs the functions recited for the 'memory interface block.'"  Br. at 7.  The first recited function of the "memory interface block" is that it is "transfer[s] a predetermined data unit received at said data input from said array controller to a plurality of different memory locations in said memory via said at least one data bus so that a copy of said predetermined data unit is stored in each of said plurality of different memory locations."  Claim 14 further specifies that the "memory interface block" "transfer[s] said predetermined data unit into said plurality of different memory locations substantially simultaneously."

The '578 Patent plainly teaches how the "memory interface block" interacts with the "array controller," "data bus," and "memory" to achieve this first function of transferring a predetermined data unit.  For example, the '578 Patent teaches that data is transferred from the "array controller" to the memory interface block via a "broadcast bus 57" or a memory request "bus 51."  '578 Patent at 10:35-38.  Moreover, the "memory interface block 37" "is capable of generating" certain "signals," such as "WE" (write enable), which is a "signal [that] controls the memory between write mode and read mode."  '578 Patent at 6:31-55.  Notably, the memory interface block can enable all memories for performing parallel writes: "[t]he memory interface turns all of the memories on at the same time (ME=1), puts all of the memories into write mode (WE=1) and

6

enables all of the inputs, BWE[1]=BWE[0]=1, so that the 8 bit value is written to each memory or memory segment of all processor units[.]" '578 Patent at 10:53-60.  The '578 Patent details how the memory interface block performs this transfer "via said at least one data bus" and the specification describes how the transfer may occur through "switching" 8-bit data onto memory bus lines "substantially simultaneously." *Id.* at 10:45-51 ("[t]he transfer of data from the broadcast bus 57 to the memory bus 41 may simply be performed by switching, so that, in this example, the 8 bit data from the AC is switched onto both sets of memory bus lines 0-7 and 8-15, and this may be done so that both sets are connected to each of the 8 one bit bus lines of the broadcast bus that are carrying the data substantially simultaneously.").  Based on these teachings, a POSITA would understand that the '578 Patent specification clearly links the memory interface block with hardware circuitry and the data transfer functionality of claim 14.  Brogioli Decl. ¶¶ 38-40.

The '578 Patent further discloses the structural nature of the "memory interface block" in connection with performing the second function recited in claim 14:  "said memory interface block is adapted to at least partially control said memory to transfer data from said memory to one or more of said plurality of processor units."  NVIDIA contends that the '578 Patent only teaches that this "control" functionality may be performed by a "controller," which is different from the "memory interface block."  Br. at 8.  NVIDIA is incorrect.  The '578 Patent teaches the following:

> To transfer the broadcast data into each processor unit, the array controller 45 issues a load (LD) request to the memory interface specifying the address (or addresses) where the broadcast data is stored. The **memory interface** then **controls** each memory to download the broadcast data into each processor unit. For example, the memory interface turns on all of the memories (ME=1), and puts all of the memories into read mode (WE=0), so that the byte of broadcast data is read from the memory segments into all processor units.

'578 Patent at 10:60 – 11:3.  That is, the '578 Patent teaches that the memory interface block—not the controller—is capable of "control[ing] each memory" so that data is downloaded to the

7

processor units.[4]  The '578 Patent teaches that the memory interface block has its own independent control functionality.  A POSITA would understand that the '578 Patent clearly links the memory interface block with hardware circuitry and the claimed functionality. Brogioli Decl. ¶¶ 38, 41.

## IV.    U.S. PATENT NO. 7,924,296 DISPUTED TERMS

### A.    "wherein the plurality of image tiles are generated when the plurality of DMA channels perform the fetching" ('296 Patent, Claims 1, 21)

| Mila's Proposed Construction | NVIDIA's Proposed Construction |
|---|---|
| No construction necessary.<br><br>Plain and ordinary meaning. | "wherein the plurality of image tiles are generated [from the at least one of the plurality of images] at the moment of the plurality of DMA channels performing the fetching" |

NVIDIA seeks to redraft the claims of the '296 Patent reciting "when" to require a strict simultaneity or cause-and-effect requirement that the tiles are generated "at the moment of" fetching.  "Absent disclaimer or lexicography, the plain meaning of the claim controls."  *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1369 (Fed. Cir. 2012).  NVIDIA cannot identify any disclaimer or lexicography that justifies limiting the scope of the term.  The plain meaning of "when" also encompasses a temporal relationship that includes generation during or as part of the fetching process, without requiring the rigid "at the moment of" limitation NVIDIA proposes.

The plain and ordinary meaning of "when" does not require strict simultaneity.  "When" commonly denotes a temporal relationship—"at the time that" or "during the period that"—which is broader than NVIDIA's proposed "at the moment of."  Brogioli Decl. ¶ 45, 48-50; *see also, e.g.*, *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1341 (Fed. Cir. 2023) ("The 'when' claim language can reasonably be understood to mean simply 'at the time that.'").  As such, Mila's position does

---

[4] While this discussion references the "memory interface," the '578 Patent teaches that "memory interface <u>block</u> 37 is capable of generating" "ME" and "WE" signals, meaning a POSITA understands this disclosure to apply equally to the claimed "memory interface block."  Brogioli Decl. ¶ 40.

not render the language meaningless. NVIDIA's construction, however, would improperly transform a flexible temporal conjunction into a rigid simultaneity requirement. Like its recent construction in *HBCU Messaging US LP v. Apple, Inc., et. al.*, No. 1:24-cv-1199-ADA, Dkt. No. 74 (W.D. Tex. Jan. 28, 2026), the Court should reject NVIDIA's argument that the term "wherein … when" requires a cause-and-effect requirement and construe the term in accordance with its "plain and ordinary meaning." *Id.*

The prosecution history directly refutes NVIDIA's construction. In response to the examiner's rejection based on the Morimoto prior-art reference, the applicant amended the claims to add the limitation at issue and argued that "Morimoto discloses that the raw image is already divided prior to the DMA channels CH0 and CH1 transferring the data, while the claims recite that plurality of image tiles are generated when the plurality of DMA channels perform the fetching." Dkt. No. 39-2 at 11. Critically, the applicant never suggested the claims required that the tiles are generated "at the moment of" fetching or any other strict simultaneity limitation. Moreover, the examiner expressly rejected the applicant's argument and explained that the term "when" has a broader meaning encompassing the situation where "the tiles should be generated prior to the DMA fetching operation":

> In response to Applicant's arguments that the cited reference fails to teach *the plurality of image tiles are generated when the plurality of DMA channels perform the fetching*, the examiner respectfully disagrees. As cited in the rejection above, Morimoto teaches the DMA channels fetches a plurality of image tiles. So, in order for the DMA channels to fetch the image tiles, the tiles should be generated prior to the DMA fetching operation. Therefore, the term "when" in the above limitation is given the broadest reasonable interpretation as in the rejection above. The Specification portions given by Applicant do not give a more specific disclosure to support the arguments to distinguish the invention from the cited reference.

Dkt. No. 39-2 at 23-24. The examiner thereby rejected the applicant's (and correspondingly NVIDIA's) suggestion that the specification provides any narrow meaning for the term "when."

9

In response to the examiner's rejection of the applicant's argument, the applicant did not dispute the examiner's broad construction of the claim language or repeat its distinction of Morimoto based on the "when" limitation. Instead, the applicant further amended the claims to add a new limitation at the end of the claim, "wherein the plurality of image sources generate a plurality of the image data to be fetched, that are of different resolution, orientation, and/or color space." Ex. 1 at 2 (Oct. 22, 2010 Amendment). Specifically, the applicant argued "Morimoto does not disclose or suggest fetching two image data of different resolution, orientation, and/or color space from each other." *Id*. at 12. The examiner then allowed the claims, explaining that Morimoto did not teach the newly added limitation. Ex. 2 at 2 (Jan. 5, 2011 Notice of Allowance).

Under these circumstances where the applicant's argument was expressly rejected, the rejected argument does not limit the scope of the claim. *See Galderma Lab'ys., L.P. v. Amneal Pharms. LLC*, 806 F. App'x 1007, 1010-11 (Fed. Cir. 2020) ("Because the record makes clear to a skilled artisan that Patent Owner's arguments were rejected, those arguments do not impact claim scope.").[5] NVIDIA's suggestion that the examiner's construction of the term "when" should be ignored because district courts "do not assign terms their broadest reasonable interpretation" is not persuasive. Br. at 12. Here, the prosecution history put the applicant and the public on notice that the claim encompasses the broader construction of the term "when", and the applicant never disputed this interpretation. *See BE Labs, Inc. v. Ubiquiti Inc.*, No. 24 CIV. 3643 (LGS), 2026 WL 114830, at *5-6 (S.D.N.Y. Jan. 15, 2026) ("Although the same interpretation standard does

---

[5] NVIDIA's reliance on *Am. Piledriving* (Br. at 12) is misplaced. In *Am. Piledriving*, the applicant's narrowing argument remained the operative basis for distinguishing prior art; here, the applicant abandoned it's "when" argument after the examiner's rejection and added an entirely new limitation—"different resolution, orientation, and/or color space"—to overcome Morimoto. The examiner allowed the claims based on this new limitation, not on any narrow construction of "when." Accordingly, *Galderma* controls under these circumstances.

not apply here, the BPAI's decision put Plaintiff, the examiner and the public on notice that the claim encompassed more than [the rejected limitation].").

The specification further confirms that NVIDIA's construction is incorrect. NVIDIA quotes a portion of the specification referring to "tiling."[6] Br. at 11. But nowhere does the specification state that "tiling" must occur at a single moment—instead, the process is described as ongoing and iterative. For example, the flowchart in Figure 3 demonstrates that the specification teaches tile generation as a multi-step process, not as a simultaneous event. *See* '296 Patent at Figure 3, Steps 304 ("Reading a tile of the source image data based on the descriptors"), 305 ("Temporarily storing the tile of the source image data in a buffer memory"), and 306 ("Fetching the tile of the source image in a certain fetching order by utilizing a plurality of DMA channels").

NVIDIA's argument that the claim language supports its construction is not persuasive. Br. at 10. In fact, NVIDIA contradicts its own construction by conceding that the "fetching cannot happen unless the image tiles exist." *Id*. (also stating "the image tiles must exist in order to be fetched"). NVIDIA thereby confirms that its construction "at the moment of", which it explains requires that "the image tiles are generated at the same time the DMA channels perform the fetching" (Br. at 9), cannot be correct. As demonstrated by the prosecution history and specification, the claims plainly allow for tile generation as a multi-step process and do not require tile generation "at the moment of" the fetching.

Finally, NVIDIA's reliance on *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1371 (Fed.

---

[6] NVIDIA misplaces reliance on *Perfect Co.* and *Siliconix* (Br. at 11). The '296 Patent's parenthetical "(tiling)" indicates that fetched portions take the form of tiles—not that fetching and tile generation are coextensive. Even accepting NVIDIA's reading that "fetching generates tiles" (Br. at 11), that proposition is causal, not a temporally simultaneous one. NVIDIA fails to establish that generation must occur "at the moment of" fetching, particularly given the specification's express description of tile generation as a multi-step process (see Fig. 3, Steps 302-306).

Cir. 2015) is inapposite. In *Info-Hold*, the construction was based on the prosecution history where Info-Hold amended the claims to add the claim language at issue and argued that the addition of the limitation overcame the prior art. *Id*. at 1374. In addition, other claim language mandated the construction where the word "placed" would otherwise have been read out of the claims. *Id*. For the '296 Patent, in contrast, the prosecution history (and other claim language) directly refutes NVIDIA's construction. NVIDIA cannot identify any support in the intrinsic evidence that justifies adding a strict "at the moment of" requirement.

## V.    U.S. PATENT NO. 7,966,436 DISPUTED TERMS

### A.    Preamble: "A data transmitter disposed between a data processor and a display device, the data transmitter comprising:" ('436 Patent, Claim 1)

| Mila's Proposed Construction | NVIDIA's Proposed Construction |
| --- | --- |
| The preamble is not limiting. No construction necessary. | The preamble is limiting. |

"[T]he presumption is that the preamble is not limiting[.]" *Parkervision, Inc v. LG Elecs., Inc.*, No. 6:21-CV-00520-ADA, 2022 WL 2240465, at *11 (W.D. Tex. June 21, 2022) (citation omitted). "[A] preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citation omitted). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Id.* (citation omitted). Here, the body of claim 1 recites a structurally complete "data transmitter" and the preamble merely states an intended use of the invention. The preamble, therefore, is not limiting.

The preamble of Claim 1 recites: "A data transmitter disposed between a data processor and a display device, the data transmitter comprising:" The claim then recites the components and functionality of the claimed "data transmitter"—it comprises a "packetization unit configured to

<u>receive</u> primary data from the data processor," a "high-speed transmission unit configured to <u>transmit</u> a data packet ... to the display device," and a "low-speed transmission unit configured to <u>relay and transmit</u> secondary data between the data processor and the display device." While the claim recites interactions between the "data transmitter" and other components, such as a "data processor" and "display device," the claim is directed to the operations of the "data transmitter." The preamble only serves to provide an environment or intended use of the "data transmitter" and is not limiting. *See Panasonic Corp. v. Magna Int'l Inc.*, No. 6:21-CV-319-ADA, 2022 WL 625089, at \*18 (W.D. Tex. Mar. 3, 2022) ("the '799 Patent and '876 Patent define a structurally complete invention in the claim body, thus confirming that the preamble is not a limitation.").

Independent claim 10 further underscores that the preamble of claim 1 is not limiting. Unlike claim 1, claim 10 expressly recites "a data processor," "a display device," and "a data transmitter disposed between the data processor and the display device" as express claim limitations. This clear difference in claim language shows that the patentee made a deliberate decision *not* to limit the scope of claim 1 in the same manner as claim 10. A finding that claim 1's preamble is limiting would, therefore, override the patentee's express intent to draft claims with different scope and that focus on different aspects of the invention. *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1347 (Fed. Cir. 2012) ("One claim is drawn only to the primary frame, and three claims are drawn only to the auxiliary frame. The fact that among numerous claims to the combination of primary and auxiliary frames the patentee chose to include some claims limited to auxiliary frames and some limited to primary frames supports the inference that the claims drawn to primary or auxiliary frames alone are not intended, by operation of the preamble, to require the presence of the other frame as well.").

13

NVIDIA is wrong that the preamble must be limiting because "a data processor" and "a display device" provide antecedent basis for those terms in the claim body.  Br. at 14-15.  A preamble is not necessarily limiting when a "generic term" is first introduced in a preamble but is not necessary for understanding the meaning of the term in the claim body.  *See Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1359 (Fed. Cir. 2010) ("the preamble term 'photoselective vaporization of tissue' does not provide a necessary antecedent basis for the term 'the tissue' in the bodies of each of the independent claims" where "the generic term 'tissue' in the preamble [did not] provide any 'context essential to understand[ing]' the meaning of 'the tissue' in the body of each claim.").  Here, claim 1's references to "the data processor" and "the display device" are understandable without first introducing those terms in the preamble.  The body of claim 1 already recites how the "data transmitter" (the focus of the claim) functions, including through its interactions with a "data processor" and "display device," in a structurally complete manner.[7]

Nor does the preamble recite "additional structure or steps underscored as important by the specification."  *Catalina Mktg.*, 289 F.3d at 808.  NVIDIA appears to argue that "a data transmitter disposed between a data processor and a display device" is an "essential arrangement" taught by the '436 Patent.  Br. at 14-15.  However, if that were true, then the patentee would have drafted claim 1 in a manner akin to claim 10, which expressly requires that arrangement as part of the claim.  More importantly, NVIDIA's argument neglects to address the fact that, as the title of the '436 Patent indicates, the invention is directed to a "[d]ata transmitter having high and low speed transmission units."  Likewise, claim 1 of the '436 Patent claims a "data transmitter" with a "high-

---

[7] Even a finding that "a data processor" and "a display device" provide antecedent basis for claim 1's later recitation of "the data processor" and "the display device" does not justify NVIDIA's request to find the entire preamble limiting.  "A conclusion that some preamble language is limiting does not imply that other preamble language, or the entire preamble, is limiting."  *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1355 (Fed. Cir. 2020).

speed transmission unit" and "low-speed transmission unit." Simply put, NVIDIA fails to demonstrate how the preamble is a "recitation of the invention's core structure."[8]

### B.    "setting data" and "device data"

| Mila's Proposed Construction | NVIDIA's Proposed Construction |
| --- | --- |
| Not indefinite. No construction necessary. | Indefinite |

NVIDIA cannot meet its burden to prove indefiniteness by clear and convincing evidence. *See Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) ("Indefiniteness must be proven by clear and convincing evidence."). A claim is not indefinite so long as it informs a POSITA about the scope of the invention with "reasonable certainty." *Nautilus, Inc. v. Biosig Instrus., Inc.*, 572 U.S. 898, 910 (2014). The '436 Patent teaches the terms "setting data" and "device data" with reasonable certainty and no further construction is required.

#### i.    Claim 1 provides meaningful guidance

Claim 1 establishes a functional distinction between the two terms: "setting data" is part of the "primary data" transmitted in a "high-speed mode," while the "device data" is part of the "secondary data" transmitted in a "low-speed" mode. Claim 1 delineates two different operational pathways for the "primary data" and the "secondary data." First, claim 1 explains that "a packetization unit" "packetize[s] the primary data," wherein the "primary data includes at least one of image data and setting data." Claim 1 further delineates that a "setting data relay" included in the "packetization unit" "packetize[s] the setting data." A "data packet" from the "packetization unit" is transmitted by the "high-speed transmission unit" in "a high-speed mode." As such, "setting data" is "primary data" transmitted by the "high-speed transmission unit."

---

[8] NVIDIA points to the '436 Patent "Summary" for its statement that "[a]ccording to an aspect of the invention, there is provided a data transmitter disposed between a data processor and a display device." Br. at 15. However, there are other "aspect[s] of the invention" described in the "Summary." Moreover, that aspect of the invention is captured in independent claim 10.

Claim 1 distinguishes "secondary data" that is "relay[ed] and [transmitted]" by "a low-speed transmission unit." The claim recites "secondary data includes <u>device data.</u>" As such, "device data" is "secondary data" that is transmitted by the "low-speed transmission unit." Thus, a POSITA would understand that the "setting data" and "device data" are distinguished by their different hardware paths and operational parameters (*i.e.*, "high-speed" vs. "low-speed" transmission, use of packetization, etc.) from the claim language alone. Brogioli Decl. ¶ 56.

### ii. "Setting data" and "device data" are not indefinite based on the teachings of the specification

The '436 Patent specification reinforces this functional framework and teaches the characteristics of the "setting data" and "device data" in a manner that informs their scope with reasonable certainty. For example, the '436 Patent teaches that "the data to be transmitted and received between the data transmitter 120 and the data receiver 135 is divided into primary data and secondary data, the primary data is transmitted in the high-speed mode, and the secondary data is transmitted or received in the low-speed mode." '436 Patent at 5:21-27.

The "setting data" is "classified in the primary data" and "packetized and transmitted from the host processor to the high-speed transmission unit through the relays of the packet processing unit." *Id.* at 5:64 – 6:1. More specifically, the '436 Patent explains that "setting data is <u>environmental information of the display device 130 required for outputting the image data</u> as an image on the display device 130." '436 Patent at 8:40; *see also id.* at 8:48-54 ("the setting data is information required for outputting the image data …."). As examples of "setting data," the '436 Patent explains that "the setting data can include light and darkness, brightness, gamma correction index, horizontal and vertical positions of a picture, and resolution." *Id.* at 8:42-45. To that end, the '436 Patent teaches the "setting data" in connection with the "primary data," identifies what "setting data" is (*i.e.*, environmental information of the display device for outputting an image),

16

and provides concrete examples of that category of data.  A POSITA would therefore understand the meaning of the term "setting data" with reasonable certainty.  Brogioli Decl. ¶¶ 54, 56-59; *see also, e.g.*, *Sci. Applications Int'l Corp. v. United States*, 169 Fed. Cl. 643, 687 (2024) ("one way a patent may resolve any indefiniteness concerns inherent in the claim language is by providing examples in the written description that guide a POSITA's understanding of the claim's scope.").

The '436 Patent provides corresponding teachings in connection with the "device data." The '436 Patent teaches that "device data" is a type of "secondary data" for transmission by the "low-speed transmission unit."  '436 Patent at 2:3-5, 9:12-19.  A POSITA understands that "device data" may correspond to "device control data," which "is transmitted in a low-speed mode."[9]  '436 Patent at 5:19-21; Brogioli Decl. ¶ 60.  The '436 Patent teaches that "device control data includes data <u>controlling an operation</u> of the display device 130."  *Id.* at 4:42-44.  As examples, the '436 Patent explains that the "device control data" can "control[] the image brightness or the image size of the display device 130[.]"  *Id.* at 4:60-65; *see also, e.g.*, *id.* at 5:5-15 ("device control data" "can include synchronization information, reset information, and low-power driving information."). These teachings indicate "device data" may be "secondary data," identifies what "device data" is (*i.e.*, data for controlling an operation of a display device), and provides examples of that category of data.  A POSITA would therefore understand the meaning of the term "device data" with reasonable certainty.  Brogioli Decl. ¶¶ 60-63.

### iii.    NVIDIA's arguments are unpersuasive

NVIDIA's indefiniteness arguments fail.  Br. at 15-17.  For example, NVIDIA complains that the '436 Patent teaches that "image brightness" can be "setting data" or "device data."  Br. at

---

[9] The '436 Patent claims priority to Korean Patent Application No. 10-2007-0140721A.  The claims in that application recites the use of "device <u>control</u> data," which indicates that the "device data" recited in the '436 Patent may include "device control data."  Brogioli Decl. ¶ 60.

16.    But the specification's examples are illustrative, not limiting.  '436 Patent at 3:30-34 ("The invention is not limited to the embodiments …."), 3:53-55 ("The terms used in the following description are used to merely describe specific embodiment, but are not intended to limit the invention.").  And, *Nautilus* requires "reasonable certainty," not mathematical precision.  *See Sonix Tech.*, 844 F.3d at 1377 ("a patentee need not define his invention with mathematical precision in order to comply with the definiteness requirement.").

Moreover, there is no reason "brightness" cannot be utilized as "setting data" (i.e., data used for outputting an image) or as "device data" (i.e., data for controlling the brightness of the display device) based on the specific implementation of the invention.  Brogioli Decl. ¶ 62.  The '436 Patent contemplates classifying data as "primary data" transmitted via a "high-speed mode" or "secondary data" transmitted via a "low-speed mode" can be implementation-specific:

> For example, the image information such as pixel values can be transmitted as the primary data in the high-speed mode and the synchronization information and the reset information can be transmitted as the secondary data in the low-speed mode. However, the division of the primary data and the secondary data is not limited to this case, but data can be divided in advance into the primary data and the secondary data depending on natures and types of the data.

'436 Patent at 5:43-46; *see also id.* at 7:64 – 8:5 ("[t]he image data and the setting data are classified in the primary data …. However, the classification is only an example ….").  Indeed, the '436 Patent expressly contemplates that "low-power driving commands" can be classified as "secondary data" and transmitted in a "low-speed mode," or alternatively, a "low-power driving command" may be transmitted as "primary data" in a "high-speed mode"—which underscores that the patent envisions different classifications of data based on the particular implementation.  *Id.* at 8:1-5, 9:3-11.  The fact that certain data may be classified as "primary data" or "secondary data" depending on the implementation does not mean that the claim is indefinite.  *See, e.g., Niazi*

18

*Licensing Corp. v. St. Jude Med. S.C., Inc.*, 30 F.4th 1339, 1347 (Fed. Cir. 2022) ("a claim is not indefinite just because it is broad.").

NVIDIA also argues that "the specification inconsistently lists resolution as an example of setting data after it lists image size as an example of device control data." Br. at 16. But a POSITA would not necessarily conflate image "resolution" with "image size." For example, "image size" refers to width and height of an image (typically in number of pixels), while "resolution" refers to the density of the pixels in an image. Brogioli Decl. ¶ 63. Regardless, as detailed above, the mere fact that certain data may be assigned as "primary data" or "secondary data" is implementation-specific and does not render the terms indefinite.

Finally, NVIDIA argues that the '436 Patent somehow states that "high-speed versus low-speed transmission depends on 'data size'" without defining what data sizes are suitable for each mode. Br. at 16-17. Yet, the claims say nothing about any "data size" requirement. Moreover, when the relevant passages are read in context, it is clear the '436 Patent only references "data size" when describing some of the benefits realized from the claimed dual-speed transmission architecture. *See* '436 Patent at 3:1-8. NVIDIA's indefiniteness challenge fails.

**C.**  **"a low-speed transmission unit configured to relay and transmit … and receive … data"**

| Mila's Proposed Construction | NVIDIA's Proposed Construction |
|---|---|
| No construction necessary. The claim term does not invoke § 112, ¶ 6.<br><br>Alternatively, should § 112, ¶ 6 apply:<br><br>Functions: relay and transmit secondary data between a data processor and a display device in a low-speed mode, and receive backward data from a display device in a low-speed mode. | Subject to § 112, ¶ 6<br><br>Indefinite |

| | |
|---|---|
| Structure: logical unit 200 and physical unit 210 or low-speed transmission unit 320 (Fig. 2, 3a, 1:63 – 2:2, 2:10-15, 4:60 – 5:49, 5:55 – 6:3, 6:13-29, 6:35 – 7:9, 7:23-35, 8:60 – 9:39), and/or corresponding figures and equivalents thereof. | |

### i.    The Term Does Not Invoke 35 U.S.C. § 112 ¶ 6

The Court should reject NVIDIA's argument that the term "low-speed transmission unit" is a means-plus-function term and is indefinite.  The term "low-speed transmission unit" does not include the language "means for."  Accordingly, the presumption is that § 112 ¶ 6 is *not* invoked. *See Dyfan*, 28 F.4th at 1365.  NVIDIA bears the burden of overcoming this presumption by a preponderance of the evidence, which it cannot do. *Id*. at 1367.

NVIDIA argues that the term "'transmission unit' lacked a structural meaning to POSITAs at the time of the application for the '436 Patent" because the term "unit" is allegedly a "nonce word." Br. at 17.  Yet, claim 1 also recites a "high-speed transmission unit," which NVIDIA does *not* contend is a means-plus-function term.  In addition, claim 1 recites a "packetization unit." NVIDIA does *not* contend that the "packetization unit" is a means-plus-function term either.  There is no way to reconcile NVIDIA's contention that the term "unit" is a nonce word, but that only one of the three "unit" terms of claim 1 is subject to means-plus-function treatment.

Courts have analyzed claims utilizing the term "transmission unit" and found that the term is not a "nonce" term subject to § 112, ¶ 6. *See Huawei Techs. Co. v. Verizon Commc'ns, Inc.*, No. 2:20-CV-00030-JRG, 2021 WL 150442, at *12 (E.D. Tex. Jan. 15, 2021) (rejecting argument that "transmission unit" was subject to § 112, ¶ 6); *Panoptis Pat. Mgmt., LLC v. Blackberry Ltd.*, No. 2:16-CV-62-JRG-RSP, 2017 WL 497571, at *8 (E.D. Tex. Feb. 7, 2017) (rejecting "transmission unit" is "a means-plus-function term" and holding that "no further construction is required."); *see also, e.g.*, *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1353

20

(Fed. Cir. 2020) ("We agree … the term 'digital processing unit' is not a 'means-plus-function' limitation subject to analysis under section 112, paragraph 6."); *TrackThings LLC v. Amazon.com, Inc.*, No. 6:21-CV-720-ADA, 2022 WL 2135009, at *6 (W.D. Tex. June 14, 2022) (rejecting argument that the "word 'unit' generally invokes 35 U.S.C. § 112, ¶ 6").[10]  Here, the '436 Patent claims, specification, and prosecution history confirm that the term "low-speed transmission unit" is not a "nonce" term and has structural meaning.

### ii.    The Claims Detail The Structural Nature Of The Term

Claim 1 of the '436 Patent describes the "low-speed transmission unit" in a structural manner that interacts with other structural components to achieve the claimed functionality.  Claim 1 recites a "data transmitter" comprising (1) a "packetization unit," (2) a "high-speed transmission unit," and (3) a "low-speed transmission unit."  Specifically, claim 1 delineates how the "low-speed transmission unit" is configured to "relay and transmit secondary data between the data processor and the display device in a low-speed mode," and also "receive backward data from the display device in the low-speed mode."  A POSITA understands this recited combination of "relay and transmit" functionality in one direction and "receive" functionality in the other, all in "low-speed mode," describes a bidirectional data interface.  Brogioli Decl. ¶ 69.  Thus, claim 1 defines the specific operations of the "low-speed transmission unit" and how those operations are performed within the architecture of the "data transmitter" in a way that connotes structure.  *See Huawei Techs.*, 2021 WL 150442, at *12 ("The claims themselves [] provide significant indicia of

---

[10] NVIDIA's reliance on *Orange Elec.* is unpersuasive. Br. at 17.  There, the Court held that the term "transmitter module" was a "means-plus-function limitation where the patentee "proffer[ed] no evidence of how" a POSITA "would understand 'transmitting module.'" *Orange Elec. Co. v. Autel Intelligent Tech., Corp.*, No. 2:21-CV-00240-JRG, 2023 WL 300137, at *5 (E.D. Tex. Jan. 18, 2023).  Regardless, the Court held that "the term is not indefinite because the specification adequately discloses that structure to a person of ordinary skill in the art." *Id.* at *7.

the structural nature of these limitations by reciting how the units and subunits interact to achieve claim-recited objectives.").

### iii.    The '436 Patent Specification And Prosecution History Confirm That The "Low-Speed Transmission Unit" Has Structural Meaning

The structural nature of the "low-speed transmission unit" is also detailed in the '436 Patent specification.  *See Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1359 (Fed. Cir. 2011), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ("The written descriptions also indicate that the 'computing unit' connotes structure to skilled artisans.").  Contrary to NVIDIA's contention, the specification does not "merely attribute th[e] functions to the transmission unit."  Br. at 18.  For example, Figure 3a depicts the "low-speed transmission unit" 320 as a component with defined inputs, outputs, and positioning within the system architecture.  Specifically, Figure 3a depicts the "low-speed transmission unit 320" in relation to the "APB controller 330" and "high-speed transmission unit 340," as well as the data paths for receiving "backward data" and receiving/transmitting "secondary data":



The '436 Patent specification further details the operations of the "low-speed transmission unit" through differential clock signaling, which indicates the use of hardware circuitry to a POSITA.  Brogioli Decl. ¶¶ 70-72.  For example, the '436 Patent explains that "[t]he data processed by the logical unit 200 is <u>digital data</u> and thus <u>should be converted into analog signals</u> for transmission to the display device 135."  '436 Patent at 6:38-41.  "The difference in transmission between the high-speed mode and the low-speed mode can be determined depending on the <u>frequency of a clock signal and a swing level</u>."  *Id.* at 6:13-16.  That is, the "data output … is transmitted in accordance with the <u>clock signal</u> provided to the data transmitter 120 and the clock signal is different between the high-speed mode and the low-speed mode."  *Id.* at 6:61-64.  For the low-speed mode, the "clock signal" may have "a swing of 1.2V."  *Id.* at 6:66-67.  "By making the frequency and the swing level of the clock signal different between the high-speed mode and the low-speed mode, the transmission rate of data is changed[.]"  *Id.* at 6:41-45.  A POSITA would understand these teachings to connote hardware circuitry.  Brogioli Decl. ¶¶ 71-73.

The '436 Patent further teaches the bi-directional nature of the "low-speed transmission unit."  '436 Patent at 9:13-19.  NVIDIA contends that "the specification provides no technical discussion at all" of the transmission unit's "receiving" function.  Br. at 18.  Not so.  For example, the '436 Patent teaches that "the data transmitter may be electrically connected to the display device through the plurality of lanes."  '436 Patent at 2:35-37.  For example, "they may be electrically connected through a PCB (printed circuit board), a flex-foil, or a cable."  *Id.* at 6:55-57.  Notably, the '436 Patent teaches "[i]t is possible to input and output a high-speed and low-voltage signal and to transmit and receive a low-speed and low-power signal through the electrical connection (lanes)."  *Id.* at 6:57-60.  Based on these teachings regarding transmitting signals

23

through "electrical connection (lanes)," a POSITA understands that the "low-speed transmission unit" refers to hardware circuitry that can transmit and receive data through electrical connections. Brogioli Decl. ¶ 73.

Finally, the prosecution history further confirms that the "low-speed transmission unit" has structural meaning. Neither the Examiner nor the Applicant ever contended that the term was subject to §112(6). *See* Brogioli Decl. at ¶ 74.

### iv.    The Term "Low-Speed Transmission Unit" Is Not Indefinite

Should the Court find the presumption ***against*** § 112, ¶ 6 is overcome, NVIDIA cannot meet its burden to demonstrate indefiniteness by clear and convincing evidence in light of the specification's extensive descriptions of the structure for the "low-speed transmission unit," as discussed in detail above and as identified by Dr. Brogioli. Brogioli Decl. ¶¶ 74.

NVIDIA argues that "'[s]ome type of undisclosed analog circuitry would be needed to relay and transmit the analog signals created by the' digital-to-analog converter (DAC)." Br. at 18) (citing Subramanian Decl. ¶ 82). But NVIDIA and its expert's understanding that the claimed functionality can be performed by "analog circuitry" demonstrates that the '436 Patent teaches the "low-speed transmission unit" with sufficient structure. A POSITA does not need a circuit schematic to ascertain the structure of the "low-speed transmission unit." The '436 Patent specification's description of converting digital and analog signals, and that the data transmitter can operate a 1.2V swing level clock at low frequency, indicates to a POSITA the functionality of the "low-speed transmission unit" is taught as hardware circuitry. Brogioli Decl. ¶¶ 76-78. As such, the '436 Patent clearly links the "low-speed transmission unit" with hardware circuitry and the relay, transmit, and receive data functionality of claim 1.

### VI.    U.S. PATENT NO. 8,151,136 DISPUTED TERMS

A.    **Preamble: "A main processor, being coupled to at least one application processor and controlling an operation of the application processor, the main processor comprising:" ('136 Patent, Claim 9)**

| Mila's Proposed Construction | NVIDIA's Proposed Construction |
|---|---|
| Preamble not limiting. No construction necessary. | The preamble is limiting. |

NVIDIA contends that the preamble of claim 9 is limiting because its recitation of "a main processor" is the antecedent basis for limitations regarding "the main processor." Br. at 20. But that is already the focus and subject matter of claim 9—the claim is directed to "[a] main processor" and the limitations of the claim detail a structurally complete "main processor." *See, e.g.*, *Panasonic*, 2022 WL 625089, at *18 ("[t]he Court [] finds that the introductory use of the term 'camera [sensor/module]' in the preambles does not make the preamble a limitation" where claim preamble recited "A camera [] …, said camera [] comprising:"). And, in any event, the mere fact that claim 9 is directed to "[a] main processor" does not somehow render the entire preamble limiting. *See Cochlear*, 958 F.3d at 1355.

NVIDIA purports that the preamble of claim 9 somehow "recites important disclosures in the specification." Br. at 21. As to claim 9, NVIDIA contends that the "preamble's recitation that the main processor controls the application processor serves to contrast the invention with prior-art systems in which the main processor sent bootup code directly to the application processor." *Id.* (citing '136 Patent at 3:11-60). But the cited discussion of the '136 Patent does not support NVIDIA's argument. While the cited portion does discuss some of the problems faced by prior art systems during "system booting," the discussion is silent as to "main processor" controlling the "application processor." '136 Patent at 3:11-60. For example, the '136 Patent describes that "the present invention provides a method and device for correcting a code data error" that "can quickly

25

transfer boot codes and processed data to an application processor"—without mentioning that the "main processor" "controls" the "application processor." *Id.*

Further, NVIDIA argues that the preamble must be limiting because "the preambles var[y] and distinguish[] different claims from each other." Br. at 21. But the '136 Patent claim preambles already accomplish that objective without any further construction. The preamble of claim 1 recites a "digital processing device comprising:" and then delineates the components and functionality of the "digital processing device." Next, claim 9 recites a "main processor comprising:" then goes on to identify the components and functionality of the "main processor." Then, unasserted claim 16 recites an "application processor comprising:…" and the body of claim 16 includes limitations regarding the components and functionality of the "application processor." Finally, claim 20 recites a "code data error correcting method" and recites all of the necessary steps for performing the method. To that end, the preambles of claims 1, 9, 16, and 20 are each directed to different aspects of the claimed invention and plainly distinguish their different scope. No further construction is necessary.

**B.**  **"A code data error correcting method by a main processor included in a digital processing device, the device comprising a main processor and at least one application processor, the method comprising:" ('136 Patent, Claim 20)**

| Mila's Proposed Construction | NVIDIA's Proposed Construction |
| --- | --- |
| Only "a main processor" is limiting. No further construction necessary. | The preamble is limiting. |

Claim 20 is directed to "[a] code data error correcting method" and the body of the claim recites a complete method for "code data error correcting." However, unlike claim 9, Mila agrees that the preamble of claim 20 recites the antecedent basis of the term "main processor" recited in the body of the claim. However, the mere fact that the preamble of claim 20 may be partially limiting does not justify a finding that the other aspects of claim 20's preamble are limiting. *See*

26

*Cochlear*, 958 F.3d at 1355. And, NVIDIA does not present any argument that any other aspects of the preamble provide antecedent basis for other elements in the body of claim 20.

NVIDIA's contention that claim 20's preamble should be limiting because "the preambles recite important disclosures in the specification" also fails. Br. at 21. NVIDIA's sole argument is that "the preamble's statement that the main processor performs error correction reflects teachings in the patent's Abstract and Summary." *Id.* (citing Abstract, '136 Patent at 4:1-30). Yet, NVIDIA seems to ignore that the cited aspects of the '136 Patent explain that "[t]he present invention also provide <u>a method</u> and a device <u>for correcting a code data error</u> …", which is already captured by the preamble of claim 20. '136 Patent at 1-3.

## VII.  U.S. PATENT NO. 8,275,975 DISPUTED TERMS

### A.  Preamble: "A sequencer controlled system for a system-on-chip (SoC) integrated circuit design, comprising:" ('975 Patent, Claim 1)

| Mila's Proposed Construction | NVIDIA's Proposed Construction |
|---|---|
| Preamble is not limiting. No construction necessary. | The preamble is limiting. |

NVIDIA cannot justify limiting the preamble of claim 1 of the '975 Patent. Claim 1 already describes a structurally complete invention for a "sequencer controller system" without the need to import additional limitations from the preamble. *Catalina Mktg.*, 289 F.3d at 808. Instead, the preamble merely states the intended use or environment for the invention—the "sequencer controlled system" is intended "for a system-on-chip (SoC) integrated circuit design."

NVIDIA purports that the preamble's reference to "a system-on-chip (SoC)" provides antecedent basis for the claim's later recitation of "processes running on <u>said SoC</u>." Br. at 22. However, the reference to "SoC" in the body of claim 1 is only used as a descriptor of a type of "processes" that qualify as "status information"—the body of claim 1 references "said SoC" only in the context of describing that the "status information" may consist of "processes running on said

27

SoC," which is tracked by the claimed "sequencer." *See* '975 Patent at 5:50-57. As such, the claim's reference to "said SoC" is understandable without resorting to the preamble. *See Marrin v. Griffin*, 599 F.3d 1290, 1295 (Fed. Cir. 2010) ("the mere fact that a structural term in the preamble is part of the claim does not mean that the preamble's statement of purpose or other description is also part of the claim").

NVIDIA also argues that "the preamble recites structure that the specification characterizes as important." Br. at 23. But the invention is directed to a "<u>sequencer</u> controlled system." For example, the '975 Patent explains that "it would be highly desirable to provide <u>an improved sequencer</u> for offloading main processor from controlling all other functional units." '975 Patent at 1:59-61; *see also, e.g.*, *id.* at 2:8-12 ("It is a general object of the present invention to provide a <u>sequencer</u> configured to control the timing of at least one operation of the functional units with stored instructions for each of the functional units"). And, claim 1 recites a structurally complete "sequencer controlled system" without the need for importing any additional structural limitations.

Finally, NVIDIA's prosecution history argument (Br. at 23) fails because the applicant's statement did not rely on the preamble's reference to an "SoC" as the operative basis for distinguishing the prior art. *See Catalina Mktg.*, 289 F.3d at 808 (preamble limiting only where patentee "relied on [it] to define the invention"). The applicant's remark that the prior art failed to disclose "a sequencer controlled system for a system-on-chip (SoC) integrated circuit design" was a characterization of the prior art's overall deficiency in failing to teach the claimed sequencer functionality—not substantive reliance on the SoC environment as a patentable distinction.

## B.    "Consisting of…", ('975 Patent, Claims 1, 18)

| Mila's Proposed Construction | NVIDIA's Proposed Construction |
| --- | --- |
| No construction necessary. | "the status information <u>limited to</u> available direct memory access (DMA) transfer |
| Plain and ordinary meaning. | channels and others selected from <u>among the</u> |

| | following three items: processes [running on said SoC], available memory area for storage, and available processing power" |
|---|---|

The Court should reject NVIDIA's attempt to limit the scope of the '975 Patent claims to disregard the open general transition phrase "comprising" and improperly exclude the use of additional, unlisted "status information." NVIDIA seeks to re-draft the following in claim 1:

> 1. A sequencer controlled system for a system-on-chip (SoC) integrated circuit design, <u>comprising</u>: …
>
> the <u>status information</u> *consisting of* available direct memory access (DMA) transfer channels *and* others selected from the group *consisting of* processes running on said SoC, available memory area for storage, and available processing power,

Claim 18 contains similar limitations but is drafted as a method claim. Mila agrees that the plain and ordinary meaning of the claims already requires that the "status information" consist of (1) "available direct memory access (DMA) transfer channels" and (2) *at least* one "other" type of "status information" from "the group of" "processes running on said SoC, available memory area for storage, and available processing power." However, because claims 1 and 18 are written as open-ended "comprising" claims, there may be additional types of "status information" that also fall within the scope of the claims.

NVIDIA's construction seeks to limit that plain reading. NVIDIA's construction contemplates that "status information" is "<u>limited to</u>" only (1) "available direct memory access (DMA) transfer channels" *and* (2) <u>only</u> one of "the following three items." That is, NVIDIA's construction goes beyond what the claims require and seek to also limit what a system *may also do* beyond those requirements. NVIDIA's proposal therefore seeks to exclude any systems that include more types of "status information." Limiting the claims in this way is not justified.

### i. "Consisting of" does not exclude other categories of "status information"

29

NVIDIA argues the use of the transitional phrase "consisting of'" means that the '975 Patent claims are "closed" and "any elements, steps or ingredients not specified in the claims" are "exclude[d]." Br. at 24-25. However, "the alternative transitional term 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements." *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1358 (Fed. Cir. 2016) (citation omitted). Here, the '975 Patent claims first use the open-ended "comprising" transitional term and are not "closed."

NVIDIA "read[s] more into *Multilayer* … than is properly found there." *Amgen Inc. v. Amneal Pharms. LLC*, 945 F.3d 1368, 1376 (Fed. Cir. 2020). Contrary to NVIDIA's argument, the Federal Circuit has explained that:

> *Multilayer* … **did not** hold broadly that, whenever "consisting of" Markush group language is present in a particular claim limitation, <u>even when the limitation follows a general claim transition phrase of "comprising,"</u> all components of an accused product that perform the general function of the particular limitation must meet the requirements of that limitation, thus precluding components outside the Markush group. No such issue was presented in those cases.

*Id.*[11] In other words, NVIDIA's argument disregards the fact the claims 1 and 18 are drafted as "comprising" claims. Here, as in *Amgen*, "the question is whether the [status information] claim limitations are written to preclude other [status information] in the claimed [system and method]." *Id*. And, just as in *Amgen*, "they are not." *Id.* at 1378. Claims 1 and 18 use of the open general transition phrase "comprising" and the presence of additional "status information" beyond what the claims list "is not inconsistent with the presence of" the "status information" language of the claims. *Id.* at 1378-79; *see also Nitride Semiconductors Co. v. Lite-On Tech. Corp.*, No. 21-CV-00183-ADA, 2022 WL 17347782, at *17 (W.D. Tex. Nov. 30, 2022) ("the claims recite both

---

[11] "A Markush claim is a particular kind of patent claim that lists alternative species or elements that can be selected as part of the claimed invention." *Multilayer*, 831 F.3d at 1357.

'comprising' and a Markush group ('the composition is one selected from Ga and Al')" and "Defendants' proposed construction attempts to limit the claim scope to compositions only having gallium or aluminum … which violates the holding of *Amgen*.").

### ii.    NVIDIA's construction improperly excludes preferred embodiments

NVIDIA's proposed construction improperly excludes preferred embodiments of the '975 Patent, which underscores that the patentee did not intend to limit the scope of the claims in the manner advocated by NVIDIA.  For example, the '975 Patent teaches:

> In one embodiment, the sequencer 110 may have thirty-two internal "Resources", 28 of these resources are 3-bit, 2 are 8-bit and 2 are 16-bit counters **used to represent an on chip entity**. On chip processes use these resources to complete their operations. The resource refers to numeric values which represent **processes** running on the SoC chip, the available storage memory, the transfer channels, the available processing power, or any other processes for the SoC chip.

'975 Patent at 5:50-57.  The '975 Patent contemplates a system with 32 resources, where the "resources" represent "processes" and reflected as "numeric values."  That type of system cannot be confined to only "status information" regarding DMA channels plus only three selected categories without excluding this preferred embodiment contemplating a sequencer that can track more than four (or even up to 32) resources.  *See Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014) ("a claim construction that excludes a preferred embodiment ... is rarely, if ever correct and would require highly persuasive evidentiary support").

### iii.    The patentee did not limit the scope of the claim during prosecution

NVIDIA's reliance on the '975 Patent prosecution history is unpersuasive.  Br. at 26-27. NVIDIA bolds the proposed claim language repeated by the patent examiner as to suggest that the patent office relied on the fact the claim was initially drafted with the phrase "at least one selected from the group consisting of …" when initially rejecting the claims.  *Id.*  But that was not the focus of the patent examiner's rejection.  Ex. 3 (May 17, 2011 Final Rejection).  Moreover, the patent

31

applicant's amendments sought to make clear that "status information" required "available DMA transfer channels and others"—meaning the claim amendment sought to clarify that "status information" regarding the "DMA transfer channels" was a requirement of the claim.  Ex. 4 (Nov. 16, 2011 Applicant Remarks).  However, the prosecution history does not indicate that the "other" categories of "status information" was intended to be limited to <u>only</u> the three other categories of "status information."  It does not follow that the patentee's decision to expressly require "status information" concerning "available DMA transfer channels" somehow means that the patentee also intended to close the universe of other potential "status information."[12]

C.    **"Embedded processor," ('975 Patent, Claim 1)**

| Mila's Proposed Construction | NVIDIA's Proposed Construction |
|---|---|
| No construction necessary.<br><br>Plain and ordinary meaning. | "A processor on said SoC" |

The Court should reject NVIDIA's attempt to impose an extraneous limitation by requiring the placement of the "embedded processor" on "said SoC."  The '975 Patent claims and specification teach the use of the term "embedded processor" in accordance with its plain and ordinary meaning.  NVIDIA does not identify any disclaimer or lexicography that justifies departing from the plain and ordinary meaning of the term. *See Toshiba*, 681 F.3d at 1369.

---

[12] NVIDIA's reliance on *Azurity Pharms.* is misplaced. Br. at 27.  In *Azurity*, the addition of "consisting of" was itself the operative basis for distinguishing the prior art—the patentee expressly relied on the closed nature of the formulation to overcome the rejection.  133 F.4th 1359, 1367 (Fed. Cir. 2025). Here, the patent applicant's change from "including at least one" to "consisting of" was a grammatical consequence of restructuring "available DMA transfer channels" as a required element, and not a decision to close the universe of other potential "status information" to avoid the prior art.

The '975 Patent plainly teaches an embedded processor not "on [the] SoC."  Indeed, the '975 Patent teaches the exact *opposite* of NVIDIA's position that the specification "repeatedly describes the processor as 'integrated' in the SoC."  Br. at 28.  Rather, the '975 Patent teaches:

> FIG. 1 is a diagram of an exemplary system 100 embodying the teachings of the present invention. **System 100** advantageously integrates the functionality of a general purpose microprocessor based computer system on *a single printed circuit (PC) board*. Referring to FIG. 1, a sequencer controlled system 100 is illustrated. **The Sequencer 110** is designed to relieve the **embedded processor 200***, as shown in FIG. 2* to some extent from controlling all the sequencing of events on the SoC chip. The **embedded processor 200** can be an ARM based processor, Tensilica, MIPS, X86, PowerPC, or any other processor *used **with** SoC systems*.

'975 Patent at 3:29-39.  In other words, in the claimed system, the "embedded processor" (a "processor used *with* SoC systems," not "on" the SoC) resides on a "printed circuit (PC) board" *with* the SoC—not "on" the "SoC."  Brogioli Decl. ¶¶ 81-82, 84-86.  A printed circuit board is distinct from a single chip or die.  Further, the list of exemplary embedded processors (*i.e.*, "an ARM based processor, Tensilica, MIPS, X86, PowerPC") is understood by a POSITA as general-purpose processor architectures implemented as discrete chipsets, not on-die SoC components.  *Id.* ¶¶ 81-82, 84-86.

Figure 2 illustrates the separation between the "embedded processor" and "System 100":



The architecture depicted in Figure 2 is consistent with the plain and ordinary meaning of the term: the '975 Patent utilizes a processor that is "embedded" within the *system* without necessarily being integrated <u>on</u> the same SoC die as the "sequencer" and functional units.

Moreover, the '975 Patent teaches that a benefit of the claimed invention is that it "advantageously allow[s] for selective control of functional units within a single chip integrated circuit device *without* burden on the main embedded processor." '975 Patent at 5:43-47. NVIDIA appears to contend this disclosure supports its limiting construction. Br. at 27. Quite the contrary, it is another statement describing the "embedded processor" as distinct from "functional units within a single chip integrated circuit device." In other words, the architecture of Figure 2.

Further, NVIDIA's arguments that "the 'embedded processor' of claim 1 is presumably different from the 'external processor' of claim 18" and "construing [embedded] to allow for an off-chip processor would render [embedded] superfluous" lack merit. Br. at 28. "[A] patentee may define the same subject matter with claims having different terminology." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) (citations omitted). Claim 1 (a system claim) requires an "embedded processor" as a part of the *system*, meaning it describes the processor as "embedded" in the system, *e.g.*, may be on the printed circuit board as discussed above. Claim 18 is a method claim and recites using an "external processor" to "configure[e] registers in a sequencer"—in other words, a processor *external* to the registers. To that end, the claims are consistent and simply describe the same "processor" but from a different perspective.

### D.    "Third hardware functional unit," ('975 Patent, Claim 5)

| Mila's Proposed Construction | NVIDIA's Proposed Construction |
|---|---|
| Court should revise claim 5 to depend on claim 4 instead of claim 1 | Indefinite |

34

The Court should revise claim 5 to depend on claim 4 instead of claim 1.  The lack of antecedent basis in claim 1 for the term "third hardware functional unit" confirms that claim 5 was intended to depend on claim 4 (not claim 1).  "A district court may correct obvious minor typographical and clerical errors in patents."  *Pavo Sols. LLC v. Kingston Tech. Co.*, 35 F. 4th 1367, 1373 (Fed. Cir. 2022).  Here, the Court should correct the typographical error because it is evident from the face of the patent, not subject to reasonable debate based on the claim language and the specification, and the prosecution history does not suggest a different interpretation.  *Id.*

Claim 1 recites "a plurality of functional units."  Dependent claims 3, 4, and 5 then delineate specific characteristics for a "first," "second," and "third" "functional unit[s]."  Claim 3 delineates "a first functional unit" "associated with only <u>trigger</u> signals," claim 4 delineates a "second functional unit" "associated with only <u>response</u> signals," and claim 5 delineates a "third functional unit" "associated with <u>both</u> <u>trigger</u> and <u>response</u> signals."  The '975 Patent specification teaches that the "plurality of functional units" may be delineated into three categories of "functional units" based on the same characteristics recited in claims 3, 4, and 5.  *See* '975 Patent at 4:1-14, 4:25-34.  A POSITA would understand dependent claims 3, 4, and 5 as directly tied to the teachings in the '975 Patent specification, and that dependent claim 5 was meant to depend from dependent claim 4, which was in turn meant to depend from dependent claim 3.  Thus, a POSITA would understand that the dependency in claim 5 is a typographical error and the only reasonable antecedent basis is found in claim 4, and the only reasonable antecedent basis for claim 4 is cound in claim 3.  Brogioli Decl. ¶¶ 88, 90-91.

## VIII.  CONCLUSION

For the foregoing reasons, Mila respectfully requests that the Court adopt its proposed construction for each of the disputed claim terms.

35

Dated:  May 6, 2026

Respectfully submitted,

*/s/ Brett Cooper*
Brett E. Cooper (NY SBN 4011011)
bcooper@bclgpc.com
Seth Hasenour (TX Bar No. 24059910)
shasenour@bclgpc.com
Jonathan Yim (NY SBN 5324967)
jyim@bclgpc.com
Drew B. Hollander (NY SBN 5378096)
dhollander@bclgpc.com
Scott Kolassa (NY SBN 4308409)
skolassa@bclgpc.com

**BC LAW GROUP, P.C.**
200 Madison Avenue, 24th Floor
New York, NY 10016
Tel: (212) 951-0100

***Counsel for Plaintiff***
***MILA US INC***

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2026, a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF Electronic Filing System.

*/s/ Brett Cooper*
Brett Cooper